UNITED STATES of America,
Plaintiff-Appellee,

v.

Ralph H. WASHINGTON,
Defendant-Appellant.

No. 84–1024.

United States Court of Appeals,
Ninth Circuit.

Argued Dec. 12, 1984.

Submitted Dec. 28, 1984.

Decided Feb. 11, 1986.

As Amended on Rehearing
Aug. 20, 1986.

Sanford Svetcov, San Francisco, Cal., for plaintiff-appellee.

William L. Osterboudt, Hallinan, Osterhoudt & Poplack, San Francisco, Cal., for defendant-appellant.

Before MERRILL, CANBY, and NORRIS, Circuit Judges.

· NORRIS, Circuit Judge:

Appellant Ralph H. Washington appeals his conviction on twelve different counts, all of which are grounded in alleged prostitution activities. The essence of the government's case is that for fifteen years Washington was the "kingpin" of a prostitution ring that operated principally in Northern California and extended into Alaska, Arizona, Nevada, Texas, and Utah. The prosecution maintains that, except for very small amounts of money paid to the prostitutes for incidental expenses, all prostitution earnings were delivered to Washington, to his bank accounts, or to his nominees. During 1976–1978, Washington filed federal tax returns claiming about $50,000 in gross income when evidence indicated that he had a gross income from prostitution amounting to between $250,000 and $300,000 per year. Under the government's theory of the case, Washington laundered the prostitution money by acquiring $1,000,000 in assets, including retail businesses, rental property, a Rolls Royce and a $350,000 residence.

Washington was tried before a jury on a multi-count indictment, including income tax violations, Travel Act violations, mail fraud, obstruction of justice, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). Washington did not contest either the reality of the prostitution or the fact of his close relationship with women who engaged in prostitution. According to Washington, the women drifted into a loose association with him not out of subservience, but in order to cope with a number of problems common to

their calling, including child care and education, personal safety, health and medical care, financial security, and loneliness. The defense contended that the chief advantage of the group was the opportunity it afforded the prostitutes to pool earnings in a safe and central place. The women, whose life styles were incompatible with using conventional bank accounts, could "draw" such funds from Washington as they might require.

At the conclusion of the government's case, the district judge dismissed four of the counts. The jury convicted Washington on Counts 1–3 (false tax returns), 4 and 8–12 (Travel Act), 13 (mail fraud), 23 and 24 (RICO), and acquitted him on the remaining counts. The jury also found the property listed in the RICO counts of the indictment to be forfeitable. Washington was sentenced to a total of twenty years imprisonment and fines of $126,000. He is in custody.

On appeal, Washington first contends that the disqualification of counsel of his choice violated his Sixth Amendment rights. He also argues that certain evidence should have been suppressed because it was obtained in violation of the Fourth Amendment. In addition, he claims that the district judge erred in restricting cross-examination of prosecution witnesses who were former prostitutes, in admitting into evidence an expurgated diary of a former prostitute without conducting an in camera review of the entire diary, and in instructing the jury on the RICO counts. Finally, he contends that his Sixth Amendment right to a jury drawn from a fair cross-section of the community was violated because the prosecutor used his peremptory challenges to exclude blacks from the petit jury.

## I

### THE SIXTH AMENDMENT RIGHT TO COUNSEL CLAIM

■ In December 1981, prior to indictment but after Washington learned that he was under investigation by the F.B.I., he retained Gerard J. Hinckley and Thomas E. Kotoske as joint counsel. Hinkley had been an attorney with the Organized Crime and Racketeering Section of the Department of Justice (the "Strike Force") from January 1972 until September 1981, when he left government service and entered private law practice. Kotoske had also been a Justice Department lawyer, serving as chief of the Strike Force in San Francisco from March 1974 until July 1979, when he entered private practice.

Shortly after Hinckley and Kotoske were retained to represent Washington, they filed a pre-indictment motion to return property seized in a 1981 search. In response, the government filed a motion to disqualify Hinckley from representing Washington on the basis of an FBI agent's affidavit stating that Hinckley had received unspecified confidential information about Washington while serving as a Strike Force lawyer. The government moved to disqualify Kotoske on the ground that he was head of the Strike Force at that time. In a counteraffidavit, Hinckley denied that he had received any confidential information about Washington when he was at the Justice Department. Kotoske stated in his affidavit that he did not talk to anyone in the Justice Department about the Washington investigation, including Hinckley. Both Hinckley and Kotoske asserted as officers of the court that no conflict of interest existed in their representation of Washington.

After denying defendant's request for an evidentiary hearing, Judge Orrick granted the government's motion to disqualify both Hinckley and Kotoske.[1] He acknowledged that the affidavits were in conflict on the issue whether Hinckley had obtained any material information about Washington's case when he was a government lawyer, but declined "to make the finding as to

---

1. The Honorable William H. Orrick, United States District Judge, presided over the pre-in-dictment hearings.

who, if anyone ... is not telling the truth." Relying upon *United States v. Miller,* 624 F.2d 1198 (3d Cir.1980), Judge Orrick disqualified Washington's chosen counsel on the ground that the appearance of impropriety created by the fact that Hinckley and Kotoske had been Strike Force lawyers outweighed Washington's "very important Sixth Amendment right to counsel of his own choice."[2] Accordingly, he found it unnecessary to resolve the conflict in the affidavits over whether Hinckley had obtained confidential information about Washington's case.[3]

It is settled law that under the Sixth Amendment criminal defendants "who can afford to retain counsel have a qualified right to obtain counsel of their choice." *United States v. Ray,* 731 F.2d 1361, 1365 (9th Cir.1984). The right "is not absolute, however, and must give way where its vindication would create a serious risk of undermining public confidence in the integrity of our legal system." *United States v. Hobson,* 672 F.2d 825, 828 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982). In seeking to disqualify a defendant's chosen counsel, the government bears a heavy burden of establishing that concerns about the integrity of the judicial process justify the disqualifica-

tion. *See United States v. Phillips,* 699 F.2d 798, 801–02 (6th Cir.1983), *overruled on other grounds, United States v. Tosh,* 733 F.2d 422 (6th Cir.1984).

The question presented by Judge Orrick's ruling is whether Washington's employment of former Strike Force lawyers created an appearance of impropriety sufficient to override his Sixth Amendment right to counsel of his choice.[4] The government, like Judge Orrick below, relies heavily on the Third Circuit's decision in *United States v. Miller,* 624 F.2d 1198 (3d Cir. 1980).[5] In *Miller,* the record was undisputed that the former government attorney was consulted on the legal aspect of every tax case arising within his district, that he had informal supervisory responsibility over such cases, and that much of the government's preparation of the case in question occurred while he was employed by the government. The Third Circuit affirmed a district court order disqualifying him from representing a criminal defendant in a tax case on the basis of an appearance of impropriety. The *Miller* court approved the district court's reliance upon the New Jersey Supreme Court's restrictive reading of the American Bar Association Model Code of Professional Responsibility Disci-

---

**2.** During the disqualification hearing, Judge Orrick stated: "What I have in this case, as I stated at the outset, are two lawyers; Mr. Kotoske and Mr. Hinckley; ... I have nothing but ... the highest regard for their integrity...."

**3.** Washington's Sixth Amendment rights had not matured at the time of the pre-indictment motion. *See Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972) (plurality). At his first appearance after indictment, however, Washington asked the court to permit Hinckley and Kotoske to re-enter the case on his behalf. The district court ultimately denied their readmission for substantially the same reasons that it initially disqualified them.

**4.** We review de novo the question whether Judge Orrick applied the correct legal standard. *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101 83 L.Ed.2d 46 (1984).

**5.** The government argues that its case for disqualification is even stronger than that in *Paul E. Iacono Structural Engineer, Inc. v. Humphrey,* 722 F.2d 435 (9th Cir.), *cert. denied,* 464 U.S.

851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983) and *Trone v. Smith,* 621 F.2d 994 (9th Cir.1980), two cases in which we have disqualified either an attorney or an entire firm. We disagree. First, those are both civil cases in which the Sixth Amendment right to counsel of choice is not implicated. Second, there was evidence that the lawyers in both of those cases exercised substantial responsibility over the case before switching sides. *Iacono,* 722 F.2d at 440 ("[The attorney's] representation of the defendants clearly meets [the substantial responsibility test], since the charges he investigated at the NLRB are based on the same incidents that are the subject of this lawsuit...."); *Trone,* 621 F.2d at 1000 ("In this case [the firm's] first representation of Smith was sufficiently extensive that institutional standards of the legal profession impose upon the attorneys a continuing obligation to the client not to change sides after the representation has ceased."). The government does not claim that either Hinckley or Kotoske had substantial responsibility over the Washington investigation.

plinary Rule 9–101(B), which provides: "A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." In an advisory opinion, the New Jersey Supreme Court had interpreted DR 9–101(B) to mean that "substantial responsibility" in a "matter" included "responsibility, whether exercised or not, over the subject matter" of a case pending in the lawyer's office, such as general responsibility over all cases in a specific area of expertise. *See In re Advisory Opinion on Professional Ethics no. 361*, 77 N.J. 199, 390 A.2d 118, 120 (1978).

We cannot accept the Third Circuit's reliance upon such a restrictive reading of the ABA disciplinary rule as a basis for denying a criminal defendant his Sixth Amendment right to counsel of his choice. We have grave doubts whether an appearance of impropriety would ever create a sufficiently serious threat to public confidence in the integrity of the judicial process to justify overriding Sixth Amendment rights. It is easy to express vague concerns about public confidence in the integrity of the judicial process. It is quite a different matter to demonstrate that public confidence will in fact be undermined if criminal defendants are permitted to retain lawyers who worked for the government in the field of law implicated by an indictment. We are unwilling to sacrifice a defendant's Sixth Amendment right to counsel of his choice on such an unsubstantiated premise. Indeed, for all we as judges know in a vacuum, the public very well may have greater confidence in the integrity of the judicial process assured that a criminal defendant's right to counsel of his choice will not be lightly denied. Accordingly, we cannot accept Judge Orrick's reasoning in the case before us that the mere status of Hinckley and Kotoske as former Strike Force lawyers is a sufficient basis for denying Washington his Sixth Amendment right to choose them as his counsel.[6]

This is not to say that a criminal defendant has a right to choose counsel who has an actual conflict of interest because of prior government employment. As we have said, a defendant's Sixth Amendment right to retain counsel of his choice is a qualified one. If, for example, Hinckley did in fact receive in confidence information that is material to the government's case that would give him an advantage in representing Washington, concerns about the integrity of the judicial process and our adversarial system of justice could possibly outweigh Washington's Sixth Amendment interests. As Judge Orrick acknowledged, the affidavits are in conflict on that very question. That conflict cannot be resolved without the benefit of an evidentiary hearing and findings by a trier of fact.

As distinguished from Hinckley, Kotoske is not charged by the government with having received confidential information about Washington's case when he was a Strike Force lawyer. Instead, the government argues that if Hinckley received confidential information, it must be attributed to Kotoske because he was Hinckley's co-counsel in representing Washington. The government contends that they must be viewed as though they were members of the same law firm. Washington disagrees, claiming that Hinckley and Kotoske were independent counsel retained to represent him jointly. Thus the relationship between Hinckley and Kotoske during their representation of Washington is in dispute, and the question whether any confidential information received by Hinckley should also

6. In weighing the public interest at stake in deciding whether Hinkley or Kotoske may be disqualified on the facts of this case, we are mindful of the strong governmental and public interest in not penalizing government workers in their choice and ability to obtain future employment. As we have noted, "A rule requiring the disqualification of a former government attorney in a new representation not merely where the attorney had substantial responsibility in the same matter while he was a public employee but also where the attorney's prior representation is substantially related to the present representation could hinder the mobility of government attorneys into private practice and thereby penalize public service and make government recruitment more difficult." *Iacono*, 722 F.2d at 441 n. 9.

be attributed to Kotoske may also require an evidentiary hearing on remand.

Because Judge Orrick applied the wrong legal standard in disqualifying Washington's chosen counsel without an evidentiary hearing, we vacate the conviction and remand the case to the district court. *See Ogden v. United States,* 303 F.2d 724, 737–38 (9th Cir.1962). If the district court determines that the disqualification of Hinckley and Kotoske was justified, the conviction may be reinstated. If, on the other hand, it is ultimately determined that the disqualification of either of his chosen counsel violated Washington's Sixth Amendment rights, he would be entitled to a new trial because denial of a criminal defendant's qualified right to retain counsel of his choice is reversible error regardless whether prejudice is shown. *See United States v. Ray,* 731 F.2d 1361, 1365 (9th Cir.1984); *United States v. Greger,* 657 F.2d 1109, 1113 (9th Cir.1981), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 281 (1983).[7]

## II

## THE FOURTH AMENDMENT ISSUES

On October 21, 1981, Oakland police officers obtained a state warrant authorizing the search of Washington's residence for records depicting sales of cocaine. The local officers informed FBI Agent David Vessel that they had obtained the warrant and, at some point during the execution of the state warrant, Vessel and other federal agents joined the Oakland officers in Washington's home. Once inside, the federal agents were given items that the local officers had set aside for them because the items might relate to prostitution. After being in Washington's home for five minutes or so, Vessel left to seek a federal warrant while two FBI agents remained to "secure the residence pending his return." A federal warrant was obtained based upon an affidavit by Vessel describing various items seized by the Oakland officers which indicated that Washington was involved in prostitution activities. In addition to the state and federal warrants in 1981, federal officers obtained four more warrants following Washington's arrest in 1983. Washington challenges all six warrants and the ensuing searches on various Fourth Amendment grounds.

### A. The Claim that the State Warrant was not Based on Probable Cause

■ Washington argues that the state warrant was not supported by probable cause. The 1981 state warrant authorized the seizure of "any records, notebooks, depicting sales and/or transactions of cocaine for money and any proceeds from sales of cocaine." Washington contends that the affidavit in support of the state warrant provided no basis for believing that evidence of *sales* of cocaine, as opposed to mere *use* of cocaine, would be present in his home. This distinction between sale and use is critical because a warrant per-

---

**7.** The government contends that recent decisions of the Supreme Court have undermined *Ray* and *Greger,* citing *United States v. Morrison,* 449 U.S. 361, 364–65, 101 S.Ct. 665, 667–68, 66 L.Ed.2d 564 (1981); *Morris v. Slappy,* 461 U.S. 1, 11–14, 103 S.Ct. 1610, 1616–18, 75 L.Ed.2d 610 (1983); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984); and *United States v. Clevenger,* 733 F.2d 1356, 1359–60 (9th Cir.1984). Therefore, it urges us to revisit the question whether a showing of prejudice from a disqualification of chosen counsel is necessary. But the cases cited by the government do not undermine *Ray* and *Greger.* Not one of the cases concerns disqualification of an attorney chosen by a defendant in a criminal case. The Sixth Amendment violations alleged were of a wholly different sort. We are most persuaded by clear statements from the Supreme Court in two recent cases indicating that whether a criminal defendant must show prejudice to obtain a new trial on the ground that his chosen counsel was erroneously disqualified is an open question. *Richardson-Merrell, Inc. v. Koller,* —— U.S. ——, 105 S.Ct. 2757, 2765, 86 L.Ed.2d 340 (1985) ("This Court has never held that prejudice is a prerequisite to reversal of a judgment following erroneous disqualification of counsel in either criminal or civil cases. As in *Flanagan,* we need not today decide this question."); *Flanagan v. United States,* 465 U.S. 259, 104 S.Ct. 1051, 1057, 79 L.Ed.2d 288 (1984) ("whether or not petitioners' claim requires a showing of prejudice, a disqualification order does not qualify as an immediately appealable collateral order....").

taining to drug sales would permit the officers to search through Washington's papers, while a warrant restricted to drug use would not. The need to prevent "general, exploratory rummaging in a person's belongs," *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038–39, 29 L.Ed.2d 564 (1971), is particularly acute here because document searches, unlike searches for other tangibles, "tend to involve broad disclosures of the intimacies of private lives, thoughts and transactions," *United States v. Heldt*, 668 F.2d 1238, 1260 (D.C.Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). As the Supreme Court has explained:

> "We recognize that there are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.... [R]esponsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy."

*Andresen v. Maryland*, 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 2749 n. 11, 49 L.Ed.2d 627 (1976).

The state search warrant is based upon a single affidavit executed by Officer Kenneth Bachman. It contains information gained from a reliable informant who had frequently consumed cocaine with Washington. It clearly establishes probable cause to believe that Washington was a user of cocaine. What is much less clear, however, is whether the affidavit adequately indicates that he was a seller of cocaine. Nevertheless, we need not reach that issue, because Washington makes no showing that the warrant was obtained by an intentional or reckless misstatement of facts or deliberate omissions tending to mislead the

magistrate. Accordingly, the evidence could not be suppressed even if the Bachman affidavit failed to furnish probable cause. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 3420–22, 82 L.Ed.2d 677 (1984); *United States v. Stanert*, 762 F.2d 775, 781, *amended*, 769 F.2d 1410 (9th Cir.1985).

**B. The Claim that the Local Officers Exceeded the Scope of their Warrant**

■ Next, Washington argues that the Oakland officers went beyond the scope of their warrant, which related to cocaine, by seizing items they thought would be of interest to the federal agents because the items might relate to the federal prostitution case. It is fundamental, of course, that a search must be confined to the terms and limitations of the warrant. *See United States v. Whitten*, 706 F.2d 1000, 1009 (9th Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). As we have already explained, the need to strictly limit the scope of the search is particularly acute when, as here, the warrant authorizes the seizure of documents. *See Andresen*, 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n. 11; *Heldt*, 668 F.2d at 1260.

The government argues that the items set aside to show to the federal agents were not seized outside the scope of the state warrant because the local officers came across the items in places where they expected to find records of drug sales, particularly in Washington's safe. Because many of the papers set aside by the local officers for the federal agents contained "references to women who either were known to be or might well be prostitutes," [8] *see* Brief of Appellee at 27, the government maintains that these items were found in plain view.

For the plain view doctrine to apply, the officers must be in a lawful position to view the items, the items must reasonably appear to be contraband or evidence of a crime, and the discovery must be inadvertent. *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983)

---

**8.** Officer Bachman testified that he had been given names by federal agents of prostitutes believed to be associated with Washington.

(plurality); *United States v. Chesher*, 678 F.2d 1353, 1356–57 (9th Cir.1982). Washington counters that the government cannot meet this test because the items that the officers seized were not on their face evidence of criminal activity. We must, therefore, determine whether the officers acted impermissibly by putting aside items that they thought were evidence of prostitution.

We begin our inquiry with *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), the most recent pronouncement of the Supreme Court on the "immediately apparent" test. In *Brown*, the seizing officer stopped an automobile as part of a routine license check and inadvertently discovered a knotted party balloon suspiciously placed between the driver's fingers. The Supreme Court held that the criminal nature of the seized object was "immediately apparent" in light of the particular officer's experience with the wide use of such balloons to carry narcotics. In his plurality opinion, Justice Rehnquist explained that "[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.*" *Id.* at 741–42, 103 S.Ct. at 1542–43 (emphasis in original) (quoting *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)). Accordingly, we apply the standard that evidence in plain view may be seized when the executing officers have "probable cause" to believe that a nexus existed between the viewed item and criminal activity. *See United States v. Szymkowiak*, 727 F.2d 95, 97 (6th Cir.1984).

The items that the local officers set aside for the federal agents included jewelry and coats; photographs of women; documents relating to Washington Enterprises and Funky Denims;[9] a Nevada driver's license in the name of Loretta Woodin; legal briefs in court cases involving Leah Pangelina and Debra Ann Frazier; and a document entitled "Criminal Forfeitures Under R.I.C.O. and Continuing Enterprises Statutes." None of these items intrinsically suggests prostitution activities. Thus, an officer could not reasonably have believed that a nexus existed between the items and prostitution unless he had extrinsic information about Washington's alleged prostitution activities or about the individual women whose names appeared on the items. Officer Bachman stated, however, that he knew that three women whose names appeared on documents in Washington's safe were prostitutes working with Washington. Declaration of Officer Kenneth W. Bachman, June 22, 1983, at 6. Any of those names, if appearing on an item, would create the nexus to criminal activity required for its seizure under the plain view doctrine.[10]

On the other hand, Officer Bachman testified that he seized and set aside for Agent Vessel any item bearing a woman's name or related to women generally. Here he went too far. There was no probable cause to link these items to women known to be prostitutes working with Washington. Therefore, we remand to the district court for an evidentiary hearing to determine whether the 1981 federal warrant was tainted by Officer Bachman's setting aside of papers relating to women not known by

---

9. Washington owned both Funky Denims, a clothing shop, and Washington Enterprises, a property rental agency.

10. For example, the search produced a document containing notations suggesting such names and prostitution activities. The notations were:

| Totals | | |
|---|---|---|
| Leah | 300.00 | |
| Terri | 655.00 | |
| Annie | 380.00 | |
| Debbie | 325.00 — | 120.00 in travelers checks |
| | 1,600.00 | |
| Total in cash | $ 1302.00 | |

| Deductions | |
|---|---|
| $ 25.00 — | rubbers, food—Terri |
| 15.50 — | Gloria—gas, cigarettes (etc.) |
| $ 230.00 | |

Because the names of women known by Officer Bachman to be prostitutes matched names on this document and the document otherwise suggested prostitution activities, it was properly seized under the plain view doctrine.

him to be prostitutes associated with Washington.[11]

## C. The Claim that the Local Search was a Subterfuge for a Federal Search

■ Washington's final challenge to the search of his home by the Oakland officers for evidence of narcotics sales is that it was a subterfuge for a search by FBI agents for evidence of prostitution. He argues that the federal agents piggybacked on the state search because they did not have sufficient evidence of Washington's involvement in prostitution activities to get a search warrant of their own.

After an evidentiary hearing limited to the issue of subterfuge, the district court rejected Washington's subterfuge claim on the ground that the state search was a bona fide search for evidence of state crimes by a state agency that had long been interested in the subject. The court found that the Oakland Police Department was the initiating agency in the initial narcotics search of Washington's home, that it had a legitimate law enforcement interest in the search, and that there was no proof of inducement. The district court also found that there was no inducement by federal officers. The question presented on appeal is whether the district court applied the correct legal standard in deciding whether it was a subterfuge search.[12]

The relevant inquiry on the subterfuge issue is whether the local search for narcotics was carried out in good faith, or whether it was meant to pave the way for the federal agents to enter Washington's home to search for evidence of prostitution.[13] We find support for this standard in the

writing of Professor LaFave as well as in two Sixth Circuit cases. LaFave explains the standard in subterfuge cases as follows:

"[T]he lack of good faith would most likely be present when the unnamed items sought could not have been included in the warrant, as where the police, knowing that they have no grounds to search the suspect's premises for evidence of crime *A*, are prompted by their desire to find such evidence to get a warrant for objects relating to crime *B*. In this sense, a good faith requirement is superior to the inadvertent discovery rule, although it also poses very difficult problems of proof.... [A] defendant is most likely to convince a court that bad faith was present if he can show that officers with enforcement interests and responsibilities unrelated to the crime for which the search warrant was issued participated in the search."

2 W. LaFave, *Search and Seizure*, § 4.11(e), at 183–84 (footnotes omitted).

We find two Sixth Circuit cases, *United States v. Sanchez*, 509 F.2d 886 (6th Cir. 1975) and *United States v. Hare*, 589 F.2d 1291 (6th Cir.1979), to be helpful. In *Sanchez*, a local law enforcement officer, preparing to execute a state court warrant for heroin, received a tip that explosives might also be present in the defendant's home. He notified a federal Alcohol, Tobacco and Firearms (ATF) agent, requesting his assistance in executing the state warrant. The ensuing search, for which no independent federal warrant was obtained, yielded no heroin but did yield a quantity of stolen explosives. In affirming an order sup-

---

11. The government argues that the federal affidavit refers only to women known to be prostitutes associated with Washington. But the affidavit does not indicate that all of the women were known by *Officer Bachman* to be prostitutes associated with Washington.

12. We review de novo the question whether the district court applied the correct legal standard. *McConney,* 728 F.2d at 1201.

13. The presence of a second law enforcement agency does not in and of itself violate the

Fourth Amendment. For example, Officer Bachman could have provided the federal officers with an affidavit describing what he had seen in Washington's home, and the affidavit could have been used in support of an application for a federal warrant to search for evidence of prostitution. Thus, the mere cooperation of a second law enforcement agency does not, standing alone, constitute a violation of the Fourth Amendment.

pressing this evidence, the Sixth Circuit stated:

> "We believe that the warrant authorized only the local officers to enter and search the Sanchez property for narcotics. It could not be used to validate the entrance of a federal officer having both probable cause and the opportunity to obtain a search warrant to search for different items of property.
>
> On the facts of this case, there were two simultaneous but distinct intrusions, each conducted by separate agencies for the purpose of securing different types of property. Each search had to be authorized independently by a separate warrant unless the warrant requirement was excused by a valid exception ... [the federal agent] chose to ignore the warrant requirement and to enter the premises with local officers who were conducting a search for unrelated property. Such action circumvents the safeguards of the federal Constitution."

509 F.2d at 889.

In *Hare*, ATF agents obtained a warrant to search for firearms. The agents suspected that drugs would be found and asked DEA agents to join the search. They did not, however, have probable cause to believe drugs would be found. The Sixth Circuit reversed a district court suppression order as to the drugs found in plain view. The court held that it was the absence of probable cause that rendered the discovery of drugs "inadvertent" under the plain view rule. As the court summarized:

> "There is perhaps, as the district court found, a hint of subterfuge here; a suggestion that the DEA was using ATF to gain access to a residence which they could not search on their own. But criminal investigations are not a game, and the DEA doesn't lose simply because it did not earn all of its points itself. This was clearly a serious, valid investigation on the part of the ATF of suspected

gun-running; there is absolutely no evidence that the warrant and search for weapons was a pretense fabricated to mask the DEA's lack of probable cause."

589 F.2d at 1296.

■ Neither LaFave nor the Sixth Circuit cases suggests that the officers who had not obtained a warrant must be shown to have induced the officers with a warrant to let them piggyback on the search. The common thread in LaFave and the Sixth Circuit cases is that purpose, not inducement, is the relevant inquiry in deciding a subterfuge claim. We agree.

Thus, although the district court's finding of the lack of inducement does not, by itself, establish that the state search was not a subterfuge for a federal search, the finding that the state search was made in good faith is dispositive of the issue. As in *Hare*, the district court essentially found that the Oakland officers' search of Washington's home for evidence of narcotics transactions was a "serious valid, investigation" and not "a pretense fabricated to mask the [federal officers'] lack of probable cause" to search for evidence of prostitution. *See Hare*, 589 F.2d at 1296. *See also United States v. Johnson*, 707 F.2d 317 (8th Cir.1983).

**D. The Claim that the 1981 Federal Warrant was an Overbroad General Warrant**

■ The Fourth Amendment requires that for a warrant to be valid, it must "particularly describ[e] the place to be searched, and the persons or things to be seized." [14] U.S. Const., amend. IV. This particularity requirement makes "general searches under [a warrant] impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *see also United States v. McClintock*, 748

14. We conduct a de novo review of search warrants that are challenged for failing to particularly describe the items to be seized. *United*

*States v. McClintock*, 748 F.2d 1278, 1282 (9th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985).

F.2d 1278, 1282 (9th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985); *United States v. Offices Known as 50 State Distributing Co.,* 708 F.2d 1371, 1374 (9th Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984); *United States v. Cardwell,* 680 F.2d 75, 77 (9th Cir.1982). We have held that where a business is searched for records, specificity is required to ensure that only the records which evidence crime will be seized and other papers will remain private. *See Cardwell,* 680 F.2d at 77–78. Thus, if items that are illegal or fraudulent are sought, the warrant must contain some guidelines to aid the officers in deciding what may or may not be seized. *Id.* at 78; *see also United States v. Gomez-Soto,* 723 F.2d 649, 653–54 (9th Cir.) (invalidating portion of a warrant calling for seizure of papers, including currency, evidencing failures to file currency transaction reports as required by Title 31 U.S.C. because it "lacks objective guidelines to aid the determination of what may or may not be seized and is thus unconstitutionally vague"), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984).

Specifically, Washington cites to three parts of the warrant in arguing that it did not satisfy this constitutional requirement of particularity. First, he objects that the agents were authorized to seize

"records, notes, documents indicating Ralph Washington's involvement and control of prostitution activity including *but not limited to,* photographs, handwritten notes, ledger books, transportation vouchers and tickets, hotel registration, receipts, bank documents as deposit slips, checks and records, toll records, bail bondsman's receipts and medical billings ..." (Emphasis added.)

Washington contends that the phrase "but not limited to" makes this section of the warrant overbroad because it did not provide any guidance to the executing agents in determining under what circumstances a bank account, an airline ticket, or any other document or photograph indicated Washington's involvement in prostitution. We disagree. We think that the phrase "in-

volvement and control of prostitution activity" is narrow enough to satisfy the particularity requirement of the Fourth Amendment. It effectively tells the officers to seize only items indicating prostitution activity. *Accord McClintock,* 748 F.2d at 1282 (approving warrant containing the language "any and all items referring to the sale of diamonds and other gemstones which are evidence of a violation of Title VIII"); *United States v. Whitten,* 706 F.2d at 1008–09 (approving warrant authorizing the seizure of "telephone books, diaries, photographs, utility bills, telephone bills, and any other papers indicating the ownership or occupancy of said residence").

■ Second, Washington objects to the fact that officers were also permitted to seize

"articles of personal property *tending to establish the wealth and financial status of Ralph Huey Washington* including but not limited to jewelry, cash, furs, documents showing ownership of stock, bonds, companies, real estate, and other personal property; documents tending to show ownership or control of companies and corporations including but not limited to Funky Denim, Washington Enterprises, and Francisco-Louisiana Incorporated; any documents tending to show the preparation of or basis for United States Department of Treasury, Internal Revenue Service, Tax Returns." (Emphasis added.)

In *Cardwell,* we held that when "[t]he only limitation on the search and seizure of appellants' business papers was the requirement that they be the instrumentality or evidence of violation of the general tax evasion statute," the warrant was overbroad. 680 F.2d at 77. The government argues that we should disregard *Cardwell* in favor of our later decision in *50 States Distributing Co.* where we held that when crime "permeated the entire business operation", it is "not possible through more particular description to segregate those business records that would be evidence" of crime, from those that are not. 708 F.2d at 1374. The government's reliance on *50*

*States Distributing Co.* is misplaced because in obtaining the 1981 federal warrant, the FBI made no showing that Washington was running a business out of his home, that any such business was permeated with crime, or that there was any reason whatsoever why records in Washington's home could not be segregated on the basis of whether or not they evidenced criminal activity. Accordingly, on the authority of *Cardwell*, we hold that the section of the warrant permitting the officers to seize articles "tending to establish the wealth and financial status" of Washington was impermissibly overbroad.

■ Finally, Washington objects to the fact that agents were authorized to search for and seize all

> "evidence of association of RALPH WASHINGTON with the following persons, *but not limited to them;* namely, Deborah McConnell, Dianè Hammerquist, Terri Griffith, Gloria Turner, Freddi Washington, Pamela McConnell and Leah Pangelina." (Emphasis added.)

He contends that this section of the warrant is overbroad because the agents could seize anything that associates Washington with any other person, regardless of any possible link to criminal activity. We agree. A warrant that permits officers to seize evidence of association between a suspect and any other person is patently overbroad.

■ Having held that two sections of the warrant are overbroad, we must now consider whether the officers acted in "objective good faith" in relying on either of the two invalid sections.[15] *Leon,* 104 S.Ct. at 3420. In *Leon,* the Supreme Court stated that evidence must be suppressed if the

warrant is "so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." 104 S.Ct. at 3422. We hold that both of the overbroad sections of the 1981 federal warrant are so facially deficient that any evidence obtained in reliance upon either of them must be suppressed.[16] Any articles seized pursuant to valid portions of the warrant need not be suppressed. *Gomez-Soto,* 723 F.2d at 654; *Cardwell,* 680 F.2d at 78.

### E. The Claim that the 1981 Federal Warrant Was not Based Upon Probable Cause

■ Washington contends that the 1981 federal warrant was not based upon probable cause of a violation of federal law because prostitution in and of itself is not a federal crime. He relies upon *United States v. Brouillette,* 478 F.2d 1171 (5th Cir.1973), which so held. We agree that a federal search warrant must be based upon a showing of probable cause that a federal crime has been committed and that evidence of that crime is present on the premises to be searched. *See* Fed.R.Crim.P. 41(b)(2). We also agree that prostitution alone is not a federal crime. But Washington's reliance upon *Brouillette* is misplaced because the affidavit underlying the 1981 federal warrant recites facts which go beyond mere prostitution and show a nexus to various federal crimes, including the Travel Act, RICO, and income tax violations. Thus we reject Washington's argument that the 1981 federal warrant was not based upon probable cause.[17]

---

15. We review de novo whether the officers acted in good faith. *United States v. Hendricks,* 743 F.2d 653, 656 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1362, 84 L.Ed.2d 382 (1985).

16. As support for our holding, we note that the affiant for one of the 1983 warrants crossed-out and initialed the phrase "but not limited to [the following persons]," indicating that he knew it was overbroad. Search Warrant for 1065 Wickham Drive, Morago, California at 2.

17. We also reject as meritless Washington's claim that he is entitled to a *Franks* hearing because Agent Vessel failed to state in the affidavit that he had participated in the search of Washington's residence by the Oakland officers. The fact that Vessel participated in the local search is irrelevant to the question whether there was probable cause for the federal agents to search the residence.

## F. The Claim that the 1983 Federal Warrants Were Overbroad

 Washington contends that all four federal search warrants issued and executed in March 1983 were overbroad.[18] One or another of these warrants authorized seizure of any paper "indicating" Washington's association with prostitution; any document showing an employer/employee relationship between persons named and unnamed; evidence of Washington's association with anyone; any documents showing ownership of five different companies; any documents "tending to show" the preparation of or basis for federal tax returns; and "evidence and instrumentalities of commission of crime involving" 26 U.S.C. § 7206(1), 18 U.S.C. §§ 1341, 1503, 1962(a) and (c), and 1952(a)(3). We hold that the parts of the warrants that authorized the seizure of documents showing an employer/employee relationship between persons named and unnamed and of evidence of Washington's association with anyone do not meet the particularity requirement of the Fourth Amendment. *See* Part II D, *supra*. For the same reasons set forth in Part II D, we also hold that these parts of the warrants are so facially deficient in particularity that the officers could not have acted in "objectively reasonable" reliance upon them. *See Leon*, 104 S.Ct. at 3420.

## III

## THE CLAIM THAT CROSS–EXAMINATION OF PROSTITUTE WITNESSES WAS UNDULY RESTRICTED

 Washington contends that his Sixth Amendment right to confront witnesses was violated when the district court unduly limited cross-examination of former prostitutes who testified for the prosecution. Washington's counsel was not permitted to ask the witnesses about their present addresses or places of employment on the ground that Washington represented a threat to their personal safety.

It is well established that asking a witness about his or her residence or place of employment falls within the scope of proper cross examination. As the Supreme Court said in *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968):

> "[W]hen the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of incourt examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself."

*Id.* at 131, 88 S.Ct. at 750 (footnote omitted).

This right of cross-examination may, however, be restricted if necessary to accommodate the personal safety of witnesses. *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir.1974) (upholding restriction on cross-examination when the informant's life had been threatened). The district court found that concerns about the personal safety of the former prostitutes outweighed the stated need of the defense to

---

**18.** Washington also contends that the four 1983 federal warrants were invalid as "fruits of the poisonous tree," *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939), in that they were based entirely on evidence obtained under invalid warrants executed in 1981. The government maintains that there are independent sources for the 1983 warrants. Because the district court did not find that the 1981 "trees" were poisoned, it did not resolve the fruits issue. On remand, the district court should determine whether any of the 1983 search was the fruit of searches conducted pursuant to the invalid portions of the 1981 federal warrant, whether independent grounds in fact existed, or whether any "taint" from any original illegality had dissipated. *See Wong Sun v. United States*, 371 U.S. 471, 491–92, 83 S.Ct. 407, 419–20, 9 L.Ed.2d 441 (1963); *Nardone*, 308 U.S. at 341, 60 S.Ct. at 268; *see also Brown v. Illinois*, 422 U.S. 590, 609, 95 S.Ct. 2254, 2264, 45 L.Ed.2d 416 (1975) (Powell, J. concurring) ("The notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost").

obtain their addresses so their reputation for truth and veracity could be investigated. On this record, which includes testimony that Washington had beaten prostitutes with a whip, a belt buckle and the cord of a curling iron, the district court did not abuse its discretion in so limiting cross-examination of prostitutes who feared Washington.[19]

## IV

## THE ADMISSION OF THE EXPURGATED DIARY OF A FORMER PROSTITUTE WITHOUT IN CAMERA REVIEW OF THE ENTIRE DIARY

The government introduced into evidence parts of a former prostitute's diary covering two years in which she was allegedly in Washington's prostitution ring. Washington moved for disclosure of the entire unexpurgated version of the diary. The government countered that the excised portions of the diary were collateral to the prostitute's testimony. The court then admitted into evidence over defendant's objection the partial diary and summary charts based upon it that the prosecution had prepared.

Washington argues that the diary was inadmissible because the court refused to review the entire diary in camera as required by the Jencks Act. 18 U.S.C.

19. We review the district court's limitation of the scope of cross-examination for an abuse of discretion. *United States v. McClintock,* 748 F.2d 1278, 1289 (9th Cir.1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985).

20. The relevant part of 18 U.S.C. § 3500(c) provides: "If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use...." 18 U.S.C. § 3500(c) (1982).

21. Washington also argues that he was entitled to the unexpurgated version of the diary under

§ 3500(c) (1982);[20] *see United States v. Jones,* 612 F.2d 453, 456 (9th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980).[21]

In a forthright concession, the government admits that the district judge erred in failing to review the diary in camera and to excise irrelevant material himself. Brief of Appellee at 43. The remedy for this error is to vacate the judgment and remand for an in camera hearing. *Ogden v. United States,* 303 F.2d 724, 737–38 (9th Cir.1962). If the district court finds the expurgated material not relevant to the subject matter of the witness's testimony, it may enter a new final judgment. If, on the other hand, it finds that relevant material was excised, it must order a new trial unless it determines that substantial rights of the defendant were not affected by the omission. *Id.* at 737–38.

## V

## THE RICO JURY INSTRUCTIONS

Washington contends that the district court erred in refusing to give his proposed instructions 26, 27, and 28, which stated that the jury was required to find, beyond a reasonable doubt, the existence of the alleged enterprise "separate and distinct" from both the pattern of racketeering and the individual defendant.[22] The

Fed.R.Crim.P. 16. His reliance on Rule 16 is misplaced. The rule does not authorize the discovery of statements made by government witnesses except as provided in 18 U.S.C. § 3500. Fed.R.Crim.P. 16(a)(2).

22. Washington does not explain in his brief his claim that the instructions should have contained a statement that the enterprise element must also be "separate and distinct" from the individual defendant. The jury was instructed that the enterprise charged in Count 23 was an association-in-fact consisting of defendants Washington, Lockett and others, and that the enterprise charged in Count 24 was Washington Enterprises, a business engaged "in the acquisition and management of" real estate, a retail clothing store, and a janitorial service. The jury was also instructed that the enterprises must have continuity, structure and purpose. We are satisfied that the jury instructions adequately embraced Washington's theory that the RICO

government concedes that in order to establish a RICO violation under *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528–29, 69 L.Ed.2d 246 (1981), it must prove the existence of both an enterprise and a connected pattern of racketeering activity. The government contends, however, that because proof of these elements may "coalesce," *id.,* and because there must be some nexus between the two, *United States v. Brooklier,* 685 F.2d 1208, 1216 (9th Cir.1982), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1195, 75 L.Ed.2d 439 (1983), an instruction to the jury that proof of the enterprise had to be "separate and distinct" from proof of the pattern of racketeering activity would be misleading. It urges us to follow *United States v. Mazzei,* 700 F.2d 85, 89 (2d Cir.), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2127, 77 L.Ed.2d 1304 (1983), where the Second Circuit held that a proposed instruction to the jury that proof of the enterprise had to be "separate and distinct" from proof of the pattern of racketeering activity was properly refused.

▇▇▇▇▇ A criminal defendant is entitled to an instruction regarding his theory of the case, but is not entitled to the particular and specific language he proposes. *United States v. James,* 576 F.2d 223, 226–27 (9th Cir.1978). The failure to give a particular instruction is reviewed in light of the adequacy of the entire charge taken in the context of the entire trial. Challenges which contest the district court's language or formulation of the charge are reversible only for an abuse of discretion. *Id.*

Reviewed as a whole, the instructions adequately define the elements of RICO and explain that the enterprise and the racketeering activity were separate elements, conveying the essence of defendant's proposed instructions. The district court, for example, explained:

defendant must be separate from the RICO enterprise.

"It is not enough to prove an enterprise on the one hand or just to prove racketeering activity on the other. There must be a showing of some sort of a structured organization conducting its affairs through some type of racketeering activity. In other words, it's the combination of the two that makes out the offense."

These instructions adequately embrace Washington's theory that engaging in a pattern of racketeering activity does not constitute an enterprise and the enterprise must be separate from the pattern of racketeering activity.

## VI

### THE SPECIAL VERDICT OF FORFEITURE

Washington claims that the district court erred in its rulings and jury instructions relating to RICO forfeiture of all of the property listed in the two RICO counts.[23] We disagree.

▇▇▇▇ First, Washington contends that because he was charged under 18 U.S.C. § 1962(a) with investing racketeering income in a "legal" enterprise, only property and interests in that named enterprise, Washington Enterprises, and not his own personal assets, are subject to forfeiture. He alleges that the court should have given his proffered instruction,[24] and that the government's evidence did not prove the listed real estate constituted interests of the enterprise.

Although the district court did not use the exact instructions that Washington requested, its instructions included the elements the jury was required to find as a basis for forfeiture: "And fourth, that the interest in property sought to be forfeited

23. Count 23 called for forfeiture of Washington's Moraga residence and his Rolls Royce. In Count 24 the government sought forfeiture of nine pieces of real property and the same Rolls Royce.

24. Defendant's proposed jury instruction No. 43 stated in part, "Accordingly, if you find that the properties named in Count Twenty-Four are assets or interests of RALPH WASHINGTON as an individual rather than assets of Washington Enterprises, those properties may not be forfeited under Count Twenty-Four."

is an asset of or is owned directly or indirectly by Washington Enterprises." Thus, there is no error as claimed.

The government also produced evidence to prove that the listed properties were acquired with racketeering proceeds and that they were assets of Washington Enterprises. By showing that the forfeited properties were acquired or maintained with Washington Enterprises' funds, the government proved that the real estate was an interest of the enterprise even though legal title was in the defendant himself or a nominee.

 Second, Washington contends that the court erred by refusing to submit the RICO forfeiture issues to the jury by special verdict as it requested and as required by Fed.R.Crim.P. 31(e).[25] The court, however, did give the jury a special verdict form for each piece of property sought to be forfeited, although not the exact one that Washington requested.[26] In light of the fact that the court instructed the jury that before it could consider forfeiture it had to unanimously find the defendant guilty of the RICO charge, we find that this special verdict format satisfied the special verdict requirement of Rule 31(e).

 Finally, Washington alleges that the court erred by not instructing the jury that only portions of his interest actually traceable to racketeering income, if any, should be subject to forfeiture. *See United States v. Zang*, 703 F.2d 1186, 1195 (10th Cir.1982), *cert. denied*, 464 U.S. 828, 104 S.Ct. 103, 78 L.Ed.2d 107 (1983). Instead, the court, guided by *United States v. Cauble*, 706 F.2d 1322, 1346–49 (5th Cir. 1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984), instructed as follows:

"And, thirdly, you must find that the proceeds or profits derived from racketeering activity provided all of or some substantial and significant part of the consideration used to acquire or to maintain the property interest thought to be forfeitable."

We agree with the Fifth Circuit that this instruction was adequate. Therefore, we see no reason to disturb the jury's verdict of forfeiture of the property listed in Counts 23 and 24. But if on remand Washington prevails in his contention that he was improperly deprived of his Sixth Amendment right to counsel, the forfeiture verdict would fall with his conviction and be subject to retrial.

# VII

## THE CLAIM THAT THE PROSECUTOR VIOLATED THE SIXTH AMENDMENT BY USING PEREMPTORY CHALLENGES TO EXCLUDE BLACKS FROM THE JURY

 The prosecutor used four peremptory challenges, three of which were used to strike from the panel the only black persons called as prospective jurors. After Washington's attorney moved for a mistrial, the prosecutor voluntarily stated, "I

---

**25.** Rule 31(e) of the Federal Rules of Criminal Procedure provides: "If the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any."

**26.** The judge instructed the jury as follows:

"The form of verdict that we prepared for you with respect to guilt or innocence on the various counts simply asks you to say on each count—there is a blank as to Count 1, blank as to Count 2. And your foreman will fill in either "Guilty" or "Innocent" on those counts as you unanimously agree on them.

With respect to the forfeitures under the 23rd Count, there is a sub-section 2 that says,

'We further find to be forfeitable'—and then there is '(A) 1065 Wickham Drive, Moraga," and then following that, there is, 'Yes' or 'No.' If you find that property to be forfeitable, if you find the government has established each of these essential elements making that property to be forfeitable, you will mark 'Yes.' If you find any elements missing, you will mark 'No.'

. . . .

Same thing is true under Count 24. This is the second portion that says, 'We find to be forfeitable'—and there is a listing of nine properties with 'Yes' or 'No' after those. And again, either you mark 'Yes' or 'No' as you unanimously find."

believe I have exercised my challenges intelligently. The reasons are not because of race and I don't think I have to state any further reason why I have challenged the people that are mentioned." 7 Reporter's Transcript (RT) at 169. The district judge then specifically asked the prosecutor on what basis he had excused Ms. Ollie Madden. The prosecutor explained that he had excused Ms. Madden because she was observed falling asleep during the voir dire process. 7 RT at 170. On appeal, Washington contends that the prosecutor's explanation was unsupported by the record.

During the hearing the prosecutor offered no reason for disqualifying the other black jurors. The judge simply suggested to the prosecutor, "And I take it you do have independent information with respect to others that you have excused that does not necessarily appear on the record here." 7 RT at 171. The prosecutor agreed. The judge then denied Washington's motion, concluding that the prosecutor had a "rational basis" for executing the peremptory challenges.

In its brief and oral argument, the government relied on *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Swain*, the Supreme Court held that the prosecutor's use of peremptory challenges to exclude blacks from the petit jury in a particular case did not violate the Equal Protection Clause of the Fourteenth Amendment absent a showing that the prosecution had followed a pattern of systematically excluding blacks in a series of cases. But after argument in this case, the Supreme Court repudiated the *Swain* evidentiary burden in *Batson v. Kentucky*, — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The *Batson* court held that a defendant may establish a prima facie case of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection in his case.

We recognize that the district judge's analysis was consistent with the controlling law at the time of trial, the *Swain* test. But because the Supreme Court has grant-

ed certiorari on the question of *Batson*'s retroactivity, *Griffith v. Kentucky*, — U.S. —, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986), *Brown v. United States*, — U.S. —, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986), we will refrain from deciding Washington's peremptory challenge claim at this time. If Washington fails to receive a new trial as a result of the district court's disposition of any of the claims we are remanding to it, he may again raise the peremptory challenge question on appeal to this court.

## CONCLUSION

We vacate the conviction and remand to the district court for further proceedings not inconsistent with this opinion.