**In re SOUTHEASTERN EQUIPMENT COMPANY SEARCH WARRANT.**

**No. 89:M0037.**

United States District Court,
S.D. Georgia,
Augusta Division.

Sept. 10, 1990.

Richard E. Allen, Augusta, Ga., for SECO.

Michael Faulkner, Asst. U.S. Atty., Augusta, Ga., for the U.S.

## ORDER

ALAIMO, District Judge.

Southeastern Equipment Company ("SECO") seeks the return of an address book taken pursuant to a March 16, 1989, search of its offices and of notes taken by one of the federal agents, Department of Defense Investigator Messersmith, who participated in that particular search. The motion is presently before the Court on the United States' appeal and SECO's cross-appeal of the magistrate's December 20, 1989, Order requiring the return of the address book to SECO and placing the notes under seal until further determination is made on appeal. For the reasons set forth below, this Court REVERSES and VACATES that Order.

### FACTS

On March 16, 1989, the offices of Southeastern Equipment Company, an international company that deals in, among other things, the trade of certain military truck parts, the shipment of which was the focus of the underlying search, were searched pursuant to a validly issued search warrant.[1] Apparently, SECO, its officers, employees and others have been targeted by a grand jury investigation for violations of the Federal Mail and Wire Fraud Statutes and 50 U.S.C.App. § 2410 (Falsification of Customs Documents). This investigation led to the information serving as the basis of the search in question; namely, that certain military truck parts were being smuggled out of the country to the Philippines in containers with incomplete or improper documentation. Three specific transactions have been identified as improperly documented, consisting of shipments from SECO to four customers: Anco Merchandising, Hi–King Motor Parts, Barcelon Automotive Parts and Global Trading. Moreover, all three shipments in question involve the same salesman at SECO.

On the day of the search, some 16 federal agents, consisting primarily of federal Customs officials, entered the premises of SECO and within a time span of approximately 11 hours perused all of the documents in SECO's offices and finally seized about 20 to 27 boxes filled with documentation believed to relate to the three transactions in question. During a disputed four hours of the search, two Department of Defense agents (Defense Criminal Investigators) searched the private office of an employee named Rick Huntington, a salesman who had never dealt with any of the foreign companies suspected in the illegal transactions but who was involved in the export of military parts. One of the Department of Defense ("DOD") agents, Agent Messersmith, took down about two pocket-sized pages of notations concerning the information viewed in the documents found in his office. Because none of the notations has anything to do with the four companies involved in the transactions subject to the search, SECO sought the return of the "information" seized in the form of the notes.

In addition to the "seizure" of the notes, the agents also seized a telephone and address book from the office of President John Smith, several business cards from Philippine companies and other documentation relating to subsidiaries of both SECO and the other trading companies named in the warrant. The only materials under appeal presently are the notes taken from the documents scrutinized in Rick Huntington's office and the address book seized from John Smith's office.

The question as to the authority of the agents to seize documents relating to the subsidiaries of all companies named in the

---

1. The warrant was issued to federal Customs Agent Todd Petrie and any authorized agent of the United States based on the affidavit of Agent Petrie. The warrant specifically listed eleven categories of items that were potentially seizable. Among the items allowed to be seized, the warrant authorized in part the seizure of "all notebooks, address books, correspondence, telex messages, fax messages, memoranda and notes, telephone toll records, including any computer-ized data relating to the above documents regarding SECO and Anco Merchandising ...; Hi–King Motor Parts ...; Barcelon Automotive Parts ...; Global Trading ... and any related companies or subsidiaries thereof." Paragraph a. of the warrant. This appears to be the only relevant portion of the warrant under appeal and, as such, the Court's discussion will be limited to this section.

warrant has been answered by a previous Order made pursuant to SECO's initial motion for the return of its property. After the search of its premises, SECO filed a motion under Fed.R.Crim.P. 41(e), contending that both the search and the search warrant were too broad in that the items to be seized were not particularly described, thereby making the description broader than that allotted on the basis of the probable cause stated in the affidavit and that the overall execution of the warrant resulted in a general search. After an April 27, 1989, hearing on the motion, the magistrate, in his Report and Recommendation dated June 14, 1989, found, first, that the items were described with sufficient particularity as required by law and, second, that the removal of documents within the eleven categories listed in the warrant was not unreasonable, since a search may be as extensive as reasonably required to locate the items described in the warrant. The magistrate concluded that indeed this search was reasonable even though every nook and cranny may have been searched in the effort to discover items authorized to be seized under the warrant, since such detail was reasonably required under the totality of the circumstances.

SECO timely objected to the determinations made by the magistrate and the objections were subsequently examined by the district court *de novo*. The court considered the magistrate's Report and Recommendation, apparently agreeing with the magistrate except to the extent that some of the materials taken were related to subsidiaries of SECO. The court found that the search was executed in an overly broad fashion, since the proper scope of the warrant was limited to "records of transactions" occurring between a specified time frame and between SECO and the four named trading companies—Anco Merchandising, Hi–King Motor Parts, Global Trading and Barcelon Automotive Parts. The court went on to say that the warrant further authorized the seizure of records of transactions relating to SECO and any subsidiary of the four trading companies listed in the warrant occurring during the same specified time frame, but did not authorize

searches of the records of any subsidiaries of SECO.

Based on its conclusions, the court, on July 28, 1989, ordered the suppression of all materials seized by the Government during its search of SECO's offices that fell outside the proper scope of the warrant as outlined by the court. The court further ordered the return of those materials to SECO, an accounting to SECO of all items seized during the search and the provision to SECO of photocopies of all seized materials not required to be returned. The case was then remanded to the magistrate to conduct any further proceedings necessary for the fulfillment of the Order.

On the same day of the Order of July 28, 1989, the Government moved for reconsideration, contending that the search warrant did in fact cover records of subsidiaries of SECO and expressly did so in paragraph a. of the warrant. The court disagreed and, in its Order of August 9, 1989, held that its interpretation of paragraph a. of the warrant did not include subsidiaries of SECO.

As required by the Order of July 28, 1989, the Government returned all documents that it believed to be covered by the Order, in addition to the requisite accounting of items taken. Because the Government failed to return the notes made during the search of Rick Huntington's office and the address book found in John Smith's office, two items that SECO believes is covered by the Order, SECO, on October 18, 1989, filed a motion to compel the Government to comply with the court's Order and return both the address book and the notes. SECO contended that the Order limited the entire scope of the warrant to "records of transactions" between SECO and the four trading companies and, as such, the address book does not constitute a "record of transactions" and should therefore be returned. As far as the notes are concerned, SECO contended that they were illegally seized because they are completely irrelevant to the transactions forming the basis of the warrant and because the Government has failed to fulfill the requirements of any exception allowing for the warrantless seizure of items. The

Government, on the other hand, contended that the Order does not limit the entire scope of the warrant to "records of transactions" but, instead, merely resolves the question of the applicability of the warrant to subsidiaries of SECO. Since address books were specifically named in the warrant, the Government contended that the seizure of John Smith's address book was allowed. Moreover, although the Government admitted that the notes are irrelevant to the issues presented under the warrant, it contended that the notes, if they constituted a seizure at all, were properly obtained pursuant to the plain-view doctrine.

After a hearing during which the magistrate heard arguments concerning both SECO's and the Government's contentions, the magistrate, on December 20, 1989, ordered the return of the address book to SECO. The magistrate found that, even though the warrant did specifically list address books as seizable items and that the July 28 Order did not limit the extent of the warrant beyond its applicability to SECO's subsidiaries, the address book should still be returned to SECO because the fact that the book contains numerous irrelevant entries in addition to references made to the four companies in question made the retention of the book prejudicial and therefore unreasonable. With respect to the notes, the magistrate ordered that they be placed under seal and given to neither party. He based his determination on the conclusion that the notes were a seizure of information that was not discovered in plain view and, as such, should not be kept by the Government. However, since a grand jury investigation is pending, the magistrate felt that the return of the notes would unduly thwart any further investigation and, finding no other alternative, placed the notes under seal in the record.

It is this Order by the magistrate that is now being appealed *de novo* before this Court. As no indictment has yet been issued, the Government contends that both the address book and the notes are necessary factors that must be made available for the grand jury investigation. SECO, on the other hand, contends that the address book is needed for the continuance of its business practices and the notes are needed

so that it can see to what extent, if any, the Government's action has wrought harm. Otherwise, the contentions made by each party are about the same as those made to the magistrate.

DISCUSSION

■ The primary question before the Court is whether the address book and/or the notes should properly be returned to SECO. Before that question can be answered, however, some preliminary matters must first be considered. The Court must first determine whether the issue of the return of this property should even be reached, given the existence of an ongoing grand jury investigation. Then, assuming a Rule 41(e) motion—or, for that matter, a motion to compel compliance with the grant of such a motion—can be considered, the Court must decide whether the address book falls within the purview of the search warrant and whether the notations taken of information found within irrelevant documents constitutes a valid warrantless search under the plain-view doctrine. Finally, as requested by SECO, the Court must determine whether the Government should be denied further access to the *ex parte* proceedings. Since the granting of such proceedings are usually made with discretion on a case-by-case basis, the Court finds that such an overall grant or denial of access to the use of such proceedings would be beyond its power. Moreover, since the record is more than satisfactory with respect to the issues before this Court, it sees no need to entertain another hearing on the matter, *ex parte* or otherwise.

I. *The Grand Jury Investigation*

On January 8, 1974, the Supreme Court decided the landmark case *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), a decision that is often recognized as the beginning of the demise of the exclusionary rule. Under the facts of that case, Calandra, a witness subpoenaed by a federal grand jury, was asked questions regarding evidence that had been seized by Government agents pursuant to a search of his place of business. Although the search was executed under a warrant validly issued in connection with an exten-

sive investigation of suspected illegal-gambling operations, no such evidence was found. Instead, a discovery was made of evidence demonstrating a suspected loan-sharking enterprise, and it was this evidence that was brought before the grand jury. Calandra refused to testify based on his Fifth Amendment privilege against self-incrimination. The Government requested a grant of immunity for Calandra, but Calandra instead requested and received a postponement of the hearing on immunity so that he could move for the suppression of the seized evidence.

Calandra moved under Fed.R.Crim.P. 41(e) for the suppression and return of the evidence seized, alleging an illegal search and seizure. The district court ordered the return and suppression of the evidence and subsequently held that Calandra was exempt from answering any questions before the grand jury based on that evidence. The Court of Appeals for the Sixth Circuit affirmed, holding that the district court properly entertained the suppression motion and properly found that the search and seizure were unlawful and that the exclusionary rule may be invoked to bar questioning on the illegally seized evidence.

The Supreme Court reversed the Court of Appeals, holding that a grand jury witness could not refuse to testify on the basis of an illegal search and seizure, because the exclusionary rule is not applicable to grand jury proceedings. Rationalizing that the Fourth Amendment exclusionary rule is nothing more than a judicially-created remedy designed to safeguard Fourth Amendment rights by deterring unlawful police misconduct, rather than a personal constitutional right of the aggrieved party, the Court refused to extend the exclusionary rule to grand jury proceedings and based its decision on the unique province of the grand jury. The Court remarked that the extension of the exclusionary rule to grand jury proceedings would unduly interfere with the effective and expeditious discharge of the grand jury's duties—duties which have historically been unrestrained by the technical, procedural and evidentiary rules governing the conduct of criminal trials. In order to insure the adequate discharge of the grand jury's responsibilities and take into account the best interests of society, it is necessary to keep the grand jury's investigative powers broad, and thereby allow for a thorough and extensive investigation which can include all types of knowledge, from tips and rumors to the personal knowledge of the grand jurors and even to illegally seized evidence proffered by the Government. *Id.* 414 U.S. at 342–53, 94 S.Ct. at 617–22, 38 L.Ed.2d at 568–74.

In addition to the grand jury's need to be able to consider all the available evidence, the Court also focused on the minimal effect application of the exclusionary rule to grand jury proceedings would have on the deterrence of future police misconduct, something which is considered to be the prime purpose underlying the exclusionary rule. Rather than applying the rule in an overly broad manner, the Court noted that the use of the rule has always been restricted to situations where its remedial goals will have the most effect. Thus, the use of the rule has been limited to occasions where the Government has sought to use the evidence to incriminate the victim of the unlawful search, such as where a criminal sanction is likely to be imposed on the victim. The Court weighed the potential injury to the historic role and functions of the grand jury against the potential benefits of the rule as applied in the grand jury context and found that, not only would suppression hearings delay and disrupt grand jury proceedings and require extended litigation of tangentially related issues, but also any incremental deterrence which might occur through the use of the rule would be speculative at best since only investigations by the grand jury would be deterred, given the application of the rule during the actual criminal trial. *Id.* 414 U.S. at 351, 94 S.Ct. at 621, 38 L.Ed.2d at 573.

The Government in the case at bar has argued that the *Calandra* ruling applies equally as well here. It is gravely mistaken, however, in its interpretation of the Supreme Court case. Although the Court in *Calandra* remarked that Rule 41(e) is no broader than the exclusionary rule and therefore does not constitute a statutory expansion of the exclusionary rule, *Calan-*

*dra,* 414 U.S. at 348 n. 6, 94 S.Ct. at 620 n. 6, that language should not be considered out of context. The Supreme Court only addressed the issue of the application of the exclusionary rule when a grand jury witness sought to invoke it during questioning. On this basis, the Court held that a witness could not refuse to answer questions on the ground that the questions arose from information contained in illegally seized items. Thus, the Court only dealt with the question of suppression and, even though the case was brought under a Rule 41(e) motion, the Court did not address whether the illegally seized evidence could be returned when a grand jury proceeding was underway. That issue was not before the Court. The Government, when seeking review of the Court of Appeals' decision, did not challenge either the appellate court's finding that the district court properly found the search of Calandra's business and seizure of his property to be illegal or the district court's order directing the return of the illegally seized property. *Calandra,* 414 U.S. at 342 n. 2, 94 S.Ct. at 617 n. 2.[2]

Moreover, although the broad language in *Calandra* seems to require the delay of any action that may impede the progress of any grand jury proceeding through unnecessary mini-trials and preliminary showings, case law after *Calandra* has undoubtedly limited the Court's ruling to suppression hearings and not motions that are merely for the return of property. *In re Warrantless Seizure, Barry Bernard Smith,* 888 F.2d 167 (D.C.Cir.1989). Rule 41(e) was amended April 25, 1989,[3] to reflect this change in the law. Under the Rule before amendment, the return of property was only permitted in the event of an illegal search and seizure; and whenever property was ordered returned, the Rule required automatic suppression.[4] Now, the Rule precludes suppression as a *de facto* result of returning property, providing solely for the return of property when the motion is made pre-indictment, subject to the imposition of any reasonable conditions the Court feels are needed to protect the subsequent use of or access to the property.[5] This change has had the effect of

**2.** In addition, the Court mentioned in another footnote the availability of the return of property which, although pertinent to this discussion, was left relatively unclear. The Court made a point of presenting other avenues of relief available to anyone who is unable to seek suppression under its ruling. Among the noted avenues of relief, the Court included the possibility for the return of the illegally seized property in addition to the exclusion of the property and its fruits from being used as evidence in a criminal trial. *Calandra,* 414 U.S. at 354 n. 10, 94 S.Ct. at 623 n. 10. From the Court's language in this footnote and the other things previously mentioned, it is apparent that the Court did not intend to prohibit the use of a Rule 41(e) motion to seek the return of illegally seized property during a grand jury proceeding.

**3.** *See* 124 F.R.D. 397, 399 (1989). The amendments took effect on December 1, 1989, and "govern all proceedings in criminal cases thereafter commenced and, insofar as just and practicable, all proceedings in criminal cases then pending." *Id.* at 399. Because the Rule was amended primarily to conform to the practice in most districts and because the present motion does involve a proceeding, albeit a pre-indictment one, in a pending criminal case, it is more than appropriate to apply the amended Rule to the motion before this Court. The language of the Rule implicitly allows pre-indictment motions to be brought before the Court, and as the

Rule is one under the Federal Rules of Criminal Procedure, it would defy the intent of the Supreme Court to say the new amendment did not apply to this proceeding. Moreover, since only a return of the property is sought and would most likely be the only remedy given due to the law established in *Calandra,* whether the old or new Rule is applied would not unreasonably alter the outcome.

**4.** Prior to amendment, Rule 41(e) provided:

(e) **Motion for Return of Property.** A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

Fed.R.Crim.P. 41(e) (1989).

**5.** The Rule still provides that, if the motion is made post-indictment, it is to be treated as a

separating the illegality of a search for the purposes of Rule 41(e) from the scope of the exclusionary rule, see *Blinder, Robinson & Co. v. United States*, 897 F.2d 1549 (10th Cir.1990), thereby allowing for the return of illegally seized property while at the same time reserving determinations respecting the scope of the exclusionary rule for judicial decisions. Notes of Advisory Committee on Rules, Fed.R.Crim.P. 41(e) (1990). Thus, with respect to the case at bar, it is evident that SECO may seek the return of its property prior to indictment, although the same may still be used in any grand jury proceeding.

## II. *Rule 41(e)* [6]

 The Government was correct, however, when it referred to the present proceeding as an equitable one. A motion made under Rule 41(e), regardless of the amendment made last year, has always been treated as one invoking the equitable jurisdiction of the Court. The Eleventh Circuit in particular has assumed jurisdiction over such motions, either in the form of requests under Rule 41(e) or simply through the Court's own inherent jurisdiction.[7] The basis for exercising this jurisdiction was first set out in *Hunsucker v. Phinney*, 497 F.2d 29 (5th Cir.1974), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975), and expounded on a little later in *Richey v. Smith*, 515 F.2d 1239 (5th Cir.1975). These cases interpreted the Court's jurisdiction as one deriving from the Court's supervisory power over its officers. Although *Hunsucker* and *Phinney* established jurisdiction over attorneys in general and IRS agents more specifically, it is evident that the Court's power extends to any other officer of the Court who attempts to retain information sought to be returned by its rightful owner. However, even where officers of the Court are involved, thereby making equitable jurisdiction exist, it does not necessarily follow that equitable jurisdiction *should be* exercised. Such jurisdiction is still within the discretion of the Court, to be exercised only with "caution and restraint." *Hunsucker*, 497 F.2d at 29. Equitable jurisdiction is deemed to be "extraordinary" and, thus, should not be exercised in every situation as to make such jurisdiction "ordinary." This is especially so at the pre-indictment stage, where it is necessary to consider what interruption, if any, such an exercise of jurisdiction would play on any ongoing investigations and proceedings.

 In *Hunsucker* and *Richey*, the Fifth Circuit Court of Appeals listed a number of considerations for the district court to consider, in addition to the general principles of equity, when determining whether to exercise this equitable jurisdiction. First and foremost, the Court should consider whether the Government, in seizing the plaintiff's property, exercised a callous disregard for the constitutional rights of the plaintiff. In addition, the Court should consider whether the plaintiff has an individual interest in and need for the return of his property; whether the plaintiff will be irreparably injured by being denied the return of his property; and, whether the plaintiff has an adequate remedy at law for the redress of his grievance. The possibility of an indictment, among other things,

---

motion to suppress and must therefore comply with the standards under Rule 12.

**6.** Rule 41(e) now provides:

(e) **Motion for Return of Property.** A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court for the district in which the property was seized for the return of the property on the ground that such person is entitled to lawful possession of the property. The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

Fed.R.Crim.P. 41(e) (1990).

**7.** As a matter of fact, Rule 41(e) is considered to be a "crystallization" of the principle of equity jurisdiction, *Smith v. Katzenbach*, 351 F.2d 810 (D.C.Cir.1965). As such, equity jurisdiction exists beyond the limits of Rule 41(e) to cover situations that had not been specifically covered by the Rule.

was considered to constitute an irreparable injury in both *Hunsucker* and *Richey* because of the probable stigmatic effect. Recent case law in other circuits, however, has discarded this reasoning, focusing instead on the actual effect the particular indictment would have. Such cases have theorized that an indictment alone would be an ordinary injury everyone has the chance of suffering, rather than an extraordinary injury requiring equitable relief. *Blinder,* 897 F.2d at 1549; *In re the Matter of the Search of Kitty's East,* 905 F.2d 1367 (10th Cir.1990). Moreover, due to the recent amendment, some jurisdictions have also eliminated the "callous disregard" requirement. Under the new form of the Rule, an illegal search and seizure, although probably equitably mandated, is no longer the sole basis for the motion. Rather, a movant need only allege a "deprivation of property" by the Government to invoke the application of the Rule. Fed.R.Crim.P. 41(e) (1990); *Kitty's East,* 905 F.2d at 1371.

Regardless of the specific equities considered, it is evident that some consideration must be given to them before jurisdiction is appropriate. Because the issue of the return of SECO's property is before this Court under SECO's motion to compel compliance with the July 28, 1989, Order requiring the return of some materials, this Court is circumscribed by the determination of jurisdiction made in that Order. It is clear that the district court's initial jurisdiction over the original Rule 41(e) motion continues to flow to this present proceeding, *United States v. Chapman,* 559 F.2d 402 (5th Cir.1977), and accordingly, this Court will proceed with the question of whether the materials in question should be returned.

### III. *The Address Book*

 SECO contends that the address book of its President, John Smith, is not a "record of transactions" as interpreted in the July 28 Order and should therefore be returned. The Court disagrees not only with the movant's contention that the address book should be returned but, more importantly, disagrees with the company's interpretation of that ruling. In that Order, although the court did find that the

warrant was executed in an overly broad fashion, the statement was qualified by an analysis of what the warrant did in fact provide. The court determined the proper scope of the warrant to be limited to records of transactions occurring between SECO and the four trading companies named in the warrant, during the time frame of December 1987 to August 1988. After this initial statement, the court expressly found that the warrant did not cover any records of SECO's subsidiaries, but only allowed the search and seizure of documents relating to transactions between SECO and any of the four named companies' subsidiaries. As the warrant expressly provides for the seizure of address books in paragraph a., it is obvious that the court only sought to clarify which companies and subsidiaries thereof were covered by the warrant during the specified time period. First, the court did not say that the warrant itself was overbroad, but only that the *execution* of it was. Thus, there was no reason to further limit what the warrant could include. Second, because the Order only qualified the warrant as to materials taken relating to subsidiaries of SECO, a reasonable interpretation of the Order, taken in conjunction with the statement regarding the overbroad execution, leads this Court to conclude that the Order was merely attempting to relieve the overbreadth effect by requiring the return of the documents concerning the subsidiaries of SECO. Finally, the Order of August 9, 1989, only encompasses when the subsidiaries of SECO were included in the warrant for purposes of the search. This further supports this Court's finding that the July 28 Order did no more than interpret the language of the warrant as a whole to exclude SECO's subsidiaries from being targets under the warrant.

Yet, even if the language of the July 28 Order could be inferred to be a limitation on the breadth of the warrant to include only "records of transactions," it would be unreasonable to assume that the court would completely disregard what was detailed in the warrant without any mention of the overbreadth of the warrant itself. First, the district court is obliged to give

deference to the initial determination of probable cause made by the magistrate. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1981). Since any narrow interpretation of the warrant would, in effect, alter the probable cause established to be sufficient by the magistrate, at least some reference as to why no deference was given should have been included in the Order. Second, it is more likely that, if the court was intending to interpret the warrant, the words "records of transactions" were simply meant to describe a catch-phrase that included all of the items listed explicitly in the warrant. Thus, under either interpretation of the July 28 Order, it is clear to this Court that the address book is an included item and thus was allowed to be seized.

■■■ The question of the Government's retention of the address book, however, is altogether different. Under the current form of Rule 41(e), the fact that the property was lawfully taken will no longer prevent the return of the property. Before the 1989 amendment, Rule 41(e) permitted persons to seek the return of their property if they were aggrieved by an unlawful search and seizure. If the Court chose to follow that old Rule, then it would be obligated to deny the return of the address book. However, since it would be just and reasonable to follow the amended version of the Rule under the circumstances, the Court is obligated to determine whether SECO should benefit from the return of the address book simply because it is aggrieved by the Government's continued possession of it.

■■■ Although the Rule fails to provide a standard for when property should be returned to a person aggrieved either by an unlawful seizure or by deprivation of the property, the Supreme Court has established that reasonableness under all of the circumstances is the test to be used. *United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983). Thus, in order to prevail, SECO must demonstrate that retention of the address book by the Government is unreasonable. Generally, however, if the Government has a need for the property in an investigation or prosecution, its retention of the property is usually reasonable. But, if the Government's legitimate interests can be satisfied even if the property is returned, continued retention of the property can become unreasonable. Committee Note to 1989 Amendment at 30, 124 F.R.D. at 428. This reasonableness approach, along with the deletion of the prior language requiring automatic suppression, evidences the Rule's attempt to avoid a hardcore all-or-nothing approach whereby the Government must either return *everything*, including copies, without use at subsequent proceedings or keep everything despite any hardship to the owner. The amended Rule takes into account the fact that reasonable accommodations can protect both the Government's interests and the property owner's rights. Thus, the Rule allows room for the return of documents and records that are relevant to ongoing or contemplated investigations and prosecutions where the Government can preserve a copy for future use, although in some circumstances equitable considerations may prevent any retention on the part of the Government, such as where an illegal search and seizure is involved. *Id.*

■■■ In the present situation, the court, in its July 28 Order, required the copying of all items lawfully seized and ordered those copies to be given to SECO. Moreover, with respect to the address book in particular, the Government has already offered to make copies upon request by SECO. With those copies, SECO could easily carry on its business. SECO alleges no other grievance regarding the Government's retention of the address book other than its inability to conduct business in general. Reason dictates, therefore, that the return of the original address book is not necessary. *See Kitty's East*, 905 F.2d at 1375 n. 8 (Government complied with company's request for copies of documents, so court did not order return). Despite the magistrate's belief that the Government's retention of the book would be unreasonable in light of the irrelevant entries and the redundancy of the information that was relevant, this Court finds that the question of prejudice or redundancy is a matter best left for trial if or when suppression is

sought. The purpose behind Rule 41(e) and other restrictions on searches and seizures is to effectuate the Fourth Amendment by protecting against official invasions of privacy and security of property, and not exclude or otherwise dispose of evidence simply because it is deemed inherently unreliable or prejudicial. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), *overruled on other grounds; United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Since SECO will have an ample opportunity to litigate the prejudicial or cumulative effect of the address book if and when it is being sought to be introduced at trial, there is no need at this stage to consider the prejudice to SECO except as related to the reasonableness inquiry. Since the address book, specifically named in the warrant, contains references to the target companies and is necessary to the Government's investigation, it should presumptively be retained by the Government. The only effect such retention would have on SECO would be the necessity of the book in the company's everyday business. The availability of copies alleviates the company's business need for the book, and any other prejudice that may result from the use of unrelated entries has not been specified. Without such specification, the Court sees no need to order the return of the original, notwithstanding any copies made.

## IV. *The Notes*

Since all parties agree that the notations made of the documents found in Rick Huntington's office were not covered by the warrant and were completely unrelated to the transactions in question, this Court will only address the question of the return of those notes under Rule 41(e) as amended. SECO's primary argument is that the seizure of the notes was illegal and, as such, the notes should be returned to the company not only to prevent the Government's unlawful use of them, but also to insure disclosure of what information has been obtained as fruits of that illegal seizure. Even though Rule 41(e) no longer requires illegality before a return is ordered, it is still an important consideration as far as

determining whether the Government's retention of the notes would be reasonable.

To determine whether the seizure of the notes was illegal, as alleged by SECO, the Court must first determine whether taking the notes did in fact constitute a seizure. The Government attempts to deny the existence of a seizure by arguing that none of the documents from which the notes were recorded was seized but that, instead, mental impressions were made; therefore, the notes do not "belong" to SECO. The Government relies on the ongoing grand jury proceeding as a basis for its argument, distinguishing *United States v. Gray,* 484 F.2d 352 (6th Cir.1973), *cert. denied,* 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974), by claiming that *Gray* dealt only with admissibility at trial and not disclosure during a grand jury investigation. What the Government fails to recognize, however, is the fact that the question of whether a seizure has occurred is one that can be answered irrespective of the stage of the proceedings. Whether a seizure has occurred has nothing to do with the *ongoing* grand jury investigation, and the fact of an investigation will not answer the question of whether the taking of the notes was a seizure. Rather, the question of whether a seizure has taken place must be answered by general search and seizure law. Cases such as *Gray* have clearly determined that the taking of notes does constitute a seizure, for it is the information itself that is seized. *See LeClair v. Hart,* 800 F.2d 692 (7th Cir.1986); *Sovereign News Co. v. United States,* 690 F.2d 569 (6th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983).

In each of the above cases, the respective courts found that the note-taking of observed information constituted a seizure. In *Gray,* police officers involved in a search for intoxicating liquors discovered some rifles while on the defendant's premises. They copied down the serial numbers of those rifles and later ran them through the computer of the National Crime Information Center, whereupon they discovered the rifles were stolen. Although the Government argued that there

was no seizure because the rifles were not taken off the premises, the Court clearly found the copying down of the serial numbers to be a seizure. In fact, the seizure was considered to be that of the information itself—the serial numbers. *Gray,* 484 F.2d at 356.

Similarly, in *Sovereign News,* the court considered the officers' note-taking of titles of films and magazines, in addition to other business records, to be a "seizure" within the scope of the Fourth Amendment. Finally, in *LeClair,* under facts very similar to those in the case at bar, IRS agents searched financial documents found on the plaintiff's premises, making oral dictation into a tape recorder and hand-written notes of their contents. The agents failed to remove the documents from the premises, but the court nevertheless found that the physical removal of the documents was not a necessary requirement for the tape recording and notes to constitute a "seizure" under the Fourth Amendment. *LeClair,* 800 F.2d at 695. These cases, among other analogous ones, make it clear that the Fourth Amendment embraces more than just the forced physical removal of tangible objects. Rather, the Fourth Amendment's purview encompasses the seizure of intangible items such as: the information contained in the financial documents which the IRS agents in *LeClair* copied; the note-taking of the titles of films and magazines in *Sovereign News,* the copying down of serial numbers from rifles in *Gray;* and even the information contained in the documents that DOD Agent Messersmith copied in the case at bar. Moreover, the method of copying chosen by the Government officials is unimportant. As the *LeClair* Court pointed out, it is the information itself, not the paper and ink or tape recorder or other copying utensil, that is actually seized. *LeClair,* 800 F.2d at 696 n. 5.

Yet, even if the notes in question are a "seizure" of information as described above, unless the notes were *unreasonably* taken, they do not amount to an illegal seizure. For example, in *Gray,* there was no nexus between the rifles whose serial numbers were copied and the crimes of selling or possessing intoxicating liquor without a license, evidence of which was the focus of the search warrant. Moreover, the officers could also not proceed under any exception to warrantless searches such as the plain-view doctrine, since the officers had no knowledge that the rifles were evidence of any other crime. In *Sovereign News,* on the other hand, the court did find a nexus between the information seized by the officers' notation of titles to obscene films and magazines and the focus of the search—documents reflecting the importation, receipt and shipment of listed obscene material in interstate commerce by the U.S. Postal Service. Although the specific titles noted were not among the ones listed in the warrant, the court validated the seizure under the plain-view doctrine. The Government tries to do the same here.

The plain-view doctrine was first recognized in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), as a method under which police officers can seize evidence when, acting pursuant to a valid search warrant, they discover objects not specifically named in the warrant but nevertheless of an incriminating character. The Court pointed out that, not only would it be inconvenient for an officer to have to ignore the evidence and obtain another warrant, but it is often necessary for an officer to seize immediately such evidence when ignoring it would place either the evidence or the officer in danger. As such, the doctrine is in reality a supplement to, or extension of, the original justification for the search, rather than a mere exception to the warrant requirement.

In order for the plain-view seizure to be considered a valid extension of the original justification for the search, three requirements must be met. *First,* the searching agents must lawfully be in the position where they viewed the disputed evidence, whether that original justification arose from a valid warrant or any of the other exceptions to the warrant requirement. *Second,* the searching agents must inadvertently discover the disputed evidence. *Third,* the incriminating nature of the disputed evidence must be immediately apparent on its face. *Coolidge,* 403 U.S. at

464, 91 S.Ct. at 2037; *United States v. Slocum,* 708 F.2d 587 (11th Cir.1983). The basic contentions at issue here are whether the searching agent who took the notes was legally there and, if so, whether his discovery of the information contained in the notes was inadvertent. Whether the incriminating nature of information was immediately apparent to that agent does not appear to be in issue, although it is evident that the information that was noted while he perused the documents became immediately apparent to him as evidence pertinent to other investigations in which he was involved.

▉ As far as the legality of Agent Messersmith's presence is concerned, SECO argues that his inclusion in the search was merely pretextual so that he could further his own separate investigation. SECO further contends that, if that is what occurred, Agent Messersmith was on the premises illegally, thereby making his seizure of the information contained in the notes illegal. The Government counters SECO's argument by contending that the Customs agents had a right to ask anyone they wished to accompany them on their search of SECO's offices. The Government is correct.

▉ Generally, federal law allows a warrant to be executed by: (1) the person to whom the warrant is directed; (2) any officer authorized by law to execute a search warrant; or (3) some other person aiding a person under (1) or (2) who is present and acting in execution of the warrant. 18 U.S.C. § 3105; *United States v. Martin,* 600 F.2d 1175 (5th Cir.1979). Todd Petrie, as an agent of the U.S. Customs Service, was specifically authorized to execute and serve any warrant that is issued under the authority of the United States. 19 U.S.C. § 1589a. Since the warrant authorizing the search of SECO's premises was specifically directed to him, it is clear that he had the power to utilize the assistance of other officers in the execution of the warrant, provided he was present and participating in the warrant's execution. DOD Investigator Messersmith, therefore, had two avenues upon which he could validate his presence on SECO's premises, either as an agent authorized to execute

search warrants or as an aid utilized by Agent Petrie in the execution of the warrant. In either situation, it is clear that Agent Petrie asked for Messersmith's participation in the search, and it is also clear that Petrie was available on the premises to answer any questions or solve any dilemmas that arose.

▉ Despite any authority that Agent Messersmith might have had to participate in the execution of the warrant, SECO claims that Messersmith failed to remain within the parameters of the warrant and used Petrie's search as a subterfuge for his own independent investigation. SECO is correct in that, generally, when one is asked to participate in the execution of a warrant, he is obligated to remain within the warrant's parameters. But this is just a reflection of what is always required when a search takes place. If the Court merely limited itself to SECO's contentions, the valid exceptions to the warrant requirement would become obsolete. Of course, if in reality Messersmith's presence was a mere pretext, none of the exceptions would apply, since his presence would be illegal. The focus of whether subterfuge has been committed, to the extent that it invalidates the questionable search, depends on the officer's purpose for being present.

▉ Case law has established that, where the search authorized by the warrant was carried out in good faith and was not designed as a pretense fabricated to mask the lack of probable cause to search for unrelated items found during the authorized search, the fact that those unrelated items were subsequently found will not invalidate the seizure of any of the items. *United States v. Washington,* 782 F.2d 807 (9th Cir.1986); *United States v. Hare,* 589 F.2d 1291 (6th Cir.1979); *United States v. Lee,* 581 F.2d 1173 (6th Cir.), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 725, 58 L.Ed.2d 707 (1978); *United States v. Sanchez,* 509 F.2d 886 (6th Cir.1975). *Hare* and *Sanchez,* two Sixth Circuit cases, best demonstrate the difference between a valid discovery of unrelated items and a discovery made during a search that was merely pretextual. In

*Sanchez,* a state law enforcement officer obtained a warrant pursuant to an informant's tip to search the defendant's premises for narcotics and, shortly thereafter, received a tip from the same informant that explosives were also present on those premises. He contacted a federal Alcohol, Tobacco and Firearms (ATF) agent, notified him of the presence of explosives and requested his assistance in executing the state warrant. The federal agent joined the search, but did not obtain a separate search warrant for the explosives, even though he had ample time to do so. During the search, explosives were found and seized by the federal agent, although no narcotics were discovered. The court found that two simultaneous but distinct searches had been conducted, one for narcotics that was pursuant to a valid warrant and another for explosives that was without a valid warrant but nevertheless made by an officer who had probable cause to believe that there were explosives on the premises. The court refused to validate the presence of the federal agent on the basis of the state officer's warrant for the very reason that the federal agent had both probable cause and the opportunity to obtain a separate search warrant for the unrelated property. *Sanchez,* 509 F.2d at 886. It is evident that, had the federal agent constrained himself to the search of narcotics and entered the premises without probable cause to believe the explosives were there, his presence would have been validated by the narcotics warrant even if he subsequently discovered the explosives during his good faith execution of the warrant.

*Hare* demonstrates the alternative proposition to *Sanchez*—that is, the lawful participation of an officer who aids a search for one item and subsequently discovers another unrelated item without probable cause to believe that the unrelated item was there. In *Hare,* ATF agents obtained a warrant to search the defendant's premises for firearms. The agents were aware at the time of their investigation that DEA agents were also investigating the defendant for suspected narcotics violations. When they obtained the warrant, the ATF agents asked the DEA agents to accompa-

ny them to supply additional manpower and assist in identifying narcotics in the event any were found during the course of the search. The ATF agents did not have any probable cause to believe that any narcotics would be found, nor did the DEA agents. Moreover, during the search, the ATF agents did the actual searching, with the DEA agents standing guard. Guns and drugs, along with drug paraphernalia, were discovered during the course of the search. Although recognizing that there was a hint of subterfuge in that the DEA agents were using the ATF agents to gain access to a place which they could not search on their own, the court held that the DEA agents would not lose simply because they "did not earn" all their "points" themselves. Rather, the search on behalf of the ATF agents was held to be a serious, valid investigation of suspected gun-running, and there was no evidence that the warrant and search for weapons was a pretext under which the DEA could hide. Although the DEA and ATF agents expected that some drugs might be found, the fact was that the DEA agents did not have the probable cause necessary to obtain a warrant and thus could not have used the ATF agents' warrant with the intent to conduct their own independent investigation. *Hare,* 589 F.2d at 1296.

Cases since *Sanchez* and *Hare* have substantiated the Sixth Circuit's reasoning. In *Washington,* for example, the Ninth Circuit found that a local police search of the defendant's residence for evidence of narcotics sales was not a subterfuge for a search by FBI agents seeking evidence of prostitution. During the course of the search, the state agents seized evidence they believed would be of interest to the federal agents for their federal prostitution case. At some point during the search of the premises, the federal agents arrived, were given the evidence and within five minutes left to obtain their own warrant, leaving behind the state agents to guard the evidence. The court reasoned that, although evidence of prostitution was discovered, the state search was a bona fide search for evidence of narcotics and was not meant to pave the way for the

federal agents to enter and search for evidence of prostitution. *Washington*, 782 F.2d at 816; *see also United States v. Diecidue*, 603 F.2d 535 (5th Cir.1979), *cert. denied, Antone v. United States*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), and *cert. denied, Gispert v. United States*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980), and *cert. denied, Miller v. United States*, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980) (officers did not maneuver themselves into a position whereby they could obtain evidence without obtaining a search warrant for the object of their search). In addition, it should be noted that the question of whether one search was a pretext for another in each of these cases was inevitably tied to the question of inadvertence under the plain-view doctrine. Generally, when an officer is lawfully on the premises under 18 U.S.C. § 3105 and inadvertently discovers evidence that he had no probable cause to believe was there, that evidence is considered to be lawfully seized under the plain-view doctrine even though he had a suspicion, or even expected, that the evidence would be there.

■ Thus, it is evident under the facts before this Court that, not only was Messersmith lawfully on SECO's premises under 18 U.S.C. § 3105, his action of taking notes of information he believed to be relevant in other investigations does not indicate an attempt by him to use the plain-view doctrine and Petrie's warrant as a pretext for his own independent search in an effort to evade the warrant requirement. There is no evidence before this Court that Messersmith believed that the information he noted would be found on the premises. As discussed below, it is apparent that the information that was discovered was done so inadvertently. Moreover, the evidence does show that he acted in good faith in carrying out the terms of the warrant. In fact, it seems that he and Agent Petrie have been working together since April 1988 on the investigation of SECO, and their search together might even be seen as a cooperative venture, which is expressly authorized by statutory and case law. *See* 18 U.S.C. § 3105; *Martin*, 600 F.2d at 1175 (federal agents lawfully allowed to aid state agents in search

for narcotics, although only state agents were authorized under state law to execute warrant). Even if Messersmith had a suspicion or expected the information unrelated to the search subject to appear, there is no evidence that he entered the premises for the purpose of discovering that material rather than for the purpose of aiding Petrie. Instead, the evidence shows that Messersmith only searched the office of Rick Huntington for a fraction of the total time of the search and that, during the search of the office, found materials relevant to transactions that *were* the subject of the search—job cards with the names of Philippine companies on them. Thus, it is evident that he was carrying out the intent of the search while in the office of Rick Huntington. Additionally, the notes that he took in Huntington's office only represent a fraction of those taken during the course of the entire search. Since only the notes from Huntington's office are in dispute, the remainder seemingly valid, it is evident that during the remainder of his time spent at the search he fully complied with the intent of the warrant. The Court concludes, therefore, that Messersmith's presence on SECO's premises was valid and not a pretext for his own independent investigation.

■ In addition to lawfully being on the premises, for plain-view to apply, the officer must also have discovered the evidence inadvertently and it must have been immediately apparent to him that the items found in plain view were evidence of a crime. It has already been established that Messersmith apparently did not have probable cause to believe that the information he found in Huntington's office would be there. For inadvertence to apply, it is not necessary that the discovery be unanticipated or unexpected. Rather, the term "inadvertent" implies that the discovery be made unintentionally. Thus, if, in the course of a properly limited search, an officer comes across other incriminating evidence which he did not know he would find and therefore did not intend to seize, the discovery of the evidence is inadvertent. Moreover, the fact that the officer may have expected to find the evidence in a

particular place does not make its discovery any less inadvertent. *Hare,* 589 F.2d at 1293–4; *United States v. Bolts,* 558 F.2d 316 (5th Cir.1977), *cert. denied, Hicks v. United States,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977), and *cert. denied, Bolts v. United States,* 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978) (fact that Government agents expected to find defendant's passport did not destroy inadvertence for the purposes of plain-view when they saw the passport on an open shelf during the arrest of the defendant at his home). This conclusion is based on the observation that officers often have some sort of expectation—whether it is merely a hunch or more strongly a suspicion—that evidence *may* be on the premises but nevertheless cannot lawfully obtain a warrant under the Fourth Amendment because expectations alone are insufficient. During the course of a search for which another legitimate purpose is authorized, therefore, where that hunch or suspicion is confirmed by actual observation, the officers are considered to be in the same position in which they would have been had they been completely surprised by the discovery. Since the officers did not have probable cause sufficient to obtain a warrant until they actually observed the evidence in connection with the otherwise justified search, the necessary exigent circumstances fully exist for plain-view to come into play. *Hare,* 589 F.2d at 1294.

Thus, under the facts before this Court, there is no reason for this Court to believe that Messersmith had probable cause sufficient to know that the information he discovered was going to be found in Huntington's office, nor is there evidence that he intended to search Huntington's office for that reason. He was searching Huntington's office as part of the overall search of the offices of SECO. This was not the only office Messersmith searched, and it is evident that this office was included in the overall search because Huntington was involved in the export end of the business. All such offices were searched in the belief that evidence pertaining to the transactions relevant in the warrant would be discovered. Moreover, although Messersmith's ongoing investigations may have given him a strong suspicion that evidence unrelated to the search at hand might be found, no mention is made in the record that he had probable cause to believe the evidence was there until he in fact discovered it. The fact that he may have had some suspicion as to the presence of the unrelated information no more lessens the existence of inadvertence than would total surprise.

Finally, in order for the notes to come fully within the plain-view doctrine, their relevance to a crime must have been immediately apparent to Messersmith when he came across the information. From the evidence presented at the *ex parte* hearing on December 15, 1989, this Court concludes that the information Messersmith noted while he perused the documents in search of information relevant under the warrant did become immediately apparent to him as important evidence for his other ongoing investigations. SECO does not dispute this. Instead, SECO makes a half-hearted contention that Messersmith's scrutiny of all the documents in Huntington's office took the subsequent seizure by note-taking out of plain-view. This Court has already established that Messersmith was properly on the premises and entitled to subject each document in the office to some degree of examination in order to ascertain whether a particular document fell within the warrant.[8] Moreover, there is no evidence that anything other than a brief perusal was made of the documents necessary to establish their relevance. Since Messersmith was allowed to examine each document until he discovered that the warrant was clearly inapplicable to the particular doc-

---

**8.** In his Report and Recommendation of June 14, 1989, the magistrate stated that, following current case law, the search of SECO's premises was no more extensive than reasonably required to locate the items described in the warrant. He found that it was necessary for the Government to examine the documents in order to decipher what items were relevant to the underlying search, and subject to seizure, and what items were outside the scope of the warrant. Since the district court did not sustain any objection to this finding in its Order of July 28, and since this Court also does not disagree with that finding, the thoroughness of the SECO search is not in question.

ument, anything that he inadvertently discovered to have evidentiary value during the course of that examination falls under the plain-view doctrine. *See Slocum*, 708 F.2d at 587 (evidence discovered during the legal search of documents on defendant's premises fell under the plain-view doctrine as the agents were lawfully present, discovered the evidence inadvertently and reasonably believed that the evidence discovered from the documents was incriminating on their face); *United States v. Heldt*, 668 F.2d 1238 (D.C.Cir.), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982) (perusal of documents authorized under warrant must cease at the time the warrant's inapplicability to each document is clear).

 However, the fact that the seizure of the notes was lawful[9] under the plain-view doctrine does not end the Court's discussion of whether the notes should be returned to SECO, since the deprivation of the property may be injurious even where the seizure is lawful. Given the equities in this situation, the Court does not find it unreasonable for the Government to retain possession of the notes. It is evident that they are important to ongoing grand jury proceedings and that the return of the information would be detrimental. SECO, on the other hand, still has the information on which the notes were taken and can continue to carry on its business. It seems that SECO's only basis for the return of the notes is so that it can see the extent to which those notes have aided any investigations. The target of a grand jury investigation generally has no right to know what evidence is being used against him nor, for that matter, does he even have a right to know whether he is *in fact* the target of the investigation.

 Any disclosure of grand jury materials made by a court must be made pursuant to Fed.R.Crim.P. 6(e) and in accordance with the law interpreting that provision.

The Supreme Court has justified such disclosures only when a particularized need for the requested disclosure is shown, and even then the access to the disclosed materials must be discrete and limited. *United States v. Procter & Gamble Co.*, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958). The Eleventh Circuit has expounded on the particularized-need requirement by describing circumstances which, in any specific case, might demonstrate a particularized need. These circumstances include: (1) circumstances that have created certain difficulties peculiar to the specific case, which (2) could be alleviated by access to specific grand jury materials, without (3) doing disproportionate harm to the salutary purpose of secrecy embodied in the grand jury process. *United States v. Liuzzo*, 739 F.2d 541 (11th Cir.1984). SECO has demonstrated no such circumstances. Merely wishing to obtain information used in a grand jury investigation in order to see the extent of that use is not sufficient evidence of a particularized need. Therefore, the Court sees no reason to return the notes to SECO. Moreover, the Court sees no need to keep the notes under seal in the record, as ordered by the magistrate, where the Government has shown the importance of the notes in the present grand jury investigation of SECO.

## CONCLUSION

Having considered all colorable claims on behalf of SECO and the United States, in addition to the magistrate's Order of December 20, 1989, this Court finds that the Government is entitled to retain both the address book and the notes in question at this stage of the proceedings. Because this Order is specifically limited to the return of the said property, it does not prevent SECO from seeking to suppress this

9. Even if the Court found the seizure of the notes to be illegal, it does not necessarily follow that they would be returned to SECO. Again, the equities of the situation would have to be weighed; and the Court doubts that, even if the seizure were illegal, it would return the notes. Given the pending grand jury investigation, it would most likely thwart the investigation to give the notes to SECO. It is firmly established that the party seeking return of illegally seized evidence should not be put in a better position than where he was before the seizure. The return of the notes would put SECO in such a position.

evidence if it is later sought to be used at a trial. Accordingly, the Order of December 20, 1989, is hereby REVERSED and VACATED, and IT IS ORDERED that the Government may retain the address book and notes in question.

SO ORDERED.