**In the Matter of the Search of William J. McCORKLE, et al.**

No. MISC–OS–97–46–22.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 1, 1997.

Paul Byron, Marie De Marco, Orlando, FL, for U.S.

Mark Horwitz, F. Lee Bailey, Robert Eagan, Orlando, FL, for movants.

## MEMORANDUM OPINION AND ORDER

BAKER, United States Magistrate Judge.

This cause came before the Court on the Movants' Emergency Motion for An Immediate Adversarial Hearing and for Return of Seized Property and Documents (Doc. No. 1). The Court granted the motion to the extent it sought a hearing, and the matter proceeded to be heard before the United States Magistrate Judge at an evidentiary hearing held June 9 and 10, 1997, and completed [1] on July 15, 1997. Based upon the evidence introduced at hearing, the briefs of the parties,[2] and a review of the entire record, the Court makes the following findings of fact [3] and conclusions of law.

---

1. The parties were originally given two days for the hearing. Movants requested additional time and were granted an additional half day. The completion of the hearing was delayed to accommodate the Court's schedule and to allow the parties to deal with rulings regarding the partial unsealing of the underlying Master Affidavit. Movants objected to the limitation of time for the hearing; however, they made no substantive proffer of additional testimony or evidence that would be produced. Notably, neither of the individual Movants testified. Although at the close of the hearing counsel stated Chantal McCorkle wished to do so, no indication was given as to the content of that proposed testimony.

2. In addition to the initial motion and memorandum, the parties briefed the issues at the conclusion of the hearing (Doc. Nos. 49 and 50). Additional briefings (Doc. No. 36 and 37) were treated as objections to the undersigned's Order scheduling the evidentiary hearing and were overruled by the District Court (Doc. No.39).

3. Because no suit for civil forfeiture nor criminal proceeding has been filed as of the date of this Order, the findings of fact are necessarily preliminary and based on the evidence presented to the Court for the sole purpose of review of the Court's determination of probable cause. The findings are therefore not to be construed as a

## Factual Background

On May 9, 1997, federal agents seized certain property of William J. McCorkle, Chantal McCorkle, and their related corporations, Amazing Cash Flow, Inc.; Pre–Foreclosure Bank Owned Properties, Inc.; Synchronol, Inc.; Cashflow, Inc.; Fortunes in Foreclosures, Inc.; Cashflow System, Inc.; MTI Investment, Inc.; Francis Leichman Corporation; Central Florida Real Estate Guide, Inc.; and American Empire Management and Development Company (herein "the Movants"). The property seized included business and other records, money located in various bank accounts, cars and other items, seized for both evidentiary and forfeiture purposes. In issuing the search and seizure warrants, this Court found probable cause to believe Movants were engaged in illegal activity, specifically violations of Title 18 U.S.C. §§ 1956 and 1957 (money laundering); Title 18 U.S.C. § 1341 (fraud by mail) and § 1343 (fraud by wire). On May 14, 1997, Movants filed the emergency motion for hearing and return of the property seized.

Movants William McCorkle and his wife, Chantal McCorkle, through the above-named companies, are in the business of selling workbooks and video courses promoting "the opportunity of a lifetime" on how to purchase for resale depressed and foreclosed real property. According to the papers filed by Movants, Cashflow System, Inc. is the major company, and the remaining corporations exist to support it. All of the companies (referred to herein as "the organization") are headquartered out of a single business address in Orlando.

The organization generates initial sales by frequent airing of a 28 minute video infomercial in which the McCorkles are seen on a yacht bearing the name "William J. McCorkle," in a private plane, in front of a luxury house, and in a helicopter.[4] The infomercial contains representations of "fortunes in foreclosures," and includes testimonials from Mr. McCorkle and others regarding the financial success that results from buying and following McCorkle's plan. Mr. McCorkle presents himself as a multi-millionaire based on his successful investments in real estate.

The infomercials promote an initial package costing $69.00 plus $10.00 for "shipping and handling."[5] This package includes a video tape and written materials purporting to be instructional as to buying financially distressed real estate. The sales pitch includes a "no questions asked money back guarantee." Interested viewers can call a toll free number to order the package. The organization then "confirms" the order and solicits the purchase of "more detailed" programs, which can run from $995 to several thousand dollars. These additional packages are sold with a "no refund" policy. (Movants' Exhibit 3, fine print). Although Movants claim in their papers that the organization also offers seminars on the program (called "boot camp" by the McCorkles), no evidence was presented as to the existence of these seminars.

In addition to the $69 + 10 program, the more expensive packages offer information on "doing deals" with McCorkle. The organization advertises that the purchaser will "learn how to become filthy rich" (Movants' Ex. 7). Primarily, the packages provide two ways to utilize the program: 1) locate and acquire the distressed property for resale or 2) find a pre-foreclosure property that meets certain criteria for the organization to purchase, then rent it back to the owner, with an option to repurchase the property. If the original owner defaults on the rent, the finder and the organization dispose of the property and split the profit (if any). In order to participate in the "option" deal, McCorkle requires the consumer to purchase the more expensive video course.

A heavily advertised aspect of the programs is the availability of "McCorkle's Money" (Movants' Ex. # 6–a) to "partner" deals with consumers who purchase the programs. The organization promises that if a customer finds an acceptable property that meets the

---

conclusive determination as to the issues in this dispute.

**4.** Apparently, there are several versions of the infomercial. In one, Robin Leach, host of the syndicated show "Lifestyles of the Rich and Fa-

mous" introduces McCorkle. The underlying theme off all of the infomercials is the fortunes to be made by following McCorkles' program.

**5.** The organization has no idea what its actual costs are for shipping and handling.

criteria (residential properties which can be purchased for under half their assessed value, or under half their appraised quick sale value, whichever is less), McCorkle will "put up all of the money for your deal" (Government's Exhibit # 3, pg. 50). The customer is responsible for finding the property and sending, by facsimile at the customer's expense, required documentation for consideration of the deal.[6] The organization claims that it does not keep track of the number of "deals" actually consummated. The number is admittedly very small in comparison to the number of packages sold.

Prior to the seizure, on November 5, 1996, Movants were sued by the State of Florida, through its Office of the Attorney General, for injunctive and statutory relief pursuant to Florida's Deceptive and Unfair Trade Practices Act (Movants' Exhibit 13—Case file for state court action—*State of Florida v. William J. McCorkle, et al.*, Case No. CI96–6619, Circuit Court of the Ninth Judicial Circuit). The State of Florida alleged that the Movants defrauded the public by failing to partner deals as promised, by "defrauding the public ... through the use of these advertisements" and alleged that Movants were moving money through sham corporations and offshore accounts (Movants' Exhibit 13, attachment 17). The State began an investigation into McCorkle and the organization, and subpoenaed numerous bank and business records. At the hearing in this case, Assistant Attorney General Lisa M. Young testified that approximately 300 complaints about the organization failing to make refunds were filed with her office alone, and additional complaints were filed with postal authorities and in other states.

At the time of the seizures, Movants represent that the organization was making 32,000 sales a month, with gross receipts of approximately five and a half million dollars a month (Doc. No. 1, pg.5). Prior to the seizure, McCorkle and the organization moved millions of dollars from the business into offshore accounts in the Cayman Islands.[7]

The Master Affidavit supporting the issuance of the search and seizure warrants[8] alleged that the representations and business practices of the McCorkles and the organization constitute mail fraud, wire fraud and money laundering, under federal law. The Master Affidavit set forth an evidentiary base to support a conclusion that there was *probable cause to believe that the organization was involved in a "get rich quick"* scheme, based on fraudulent representations and practices. The Master Affidavit asserted that refunds were not being provided as promised; that deals were not being "partnered," despite strict adherence to the published criteria; that the representations of *fortunes to be made*, as well as representations regarding the wealth and personal success of William McCorkle using his plan, were untrue; and, generally, that the business opportunity presented by the McCorkle organization was fraudulently depicted.

Subsequent to the search and seizure of the subject property, Movants filed this motion, seeking relief pursuant to Rule 41, Federal Rules of Criminal Procedure, Rule E(4)(f), Supplemental Rules for Certain Admiralty and Maritime Claims, the United States Constitution and general equitable principles.

### Jurisdiction

These matters in dispute first came before the Court upon the *ex parte* application by the government for issuance of search and

6. The "minimum documentation" needed before the organization makes a decision on the property includes a re-instatement letter, copies of all judgments or liens, cost and time for repairs, MAI real estate appraisal, comparable market analysis by licensed local Realtor who has personally inspected the property, print-out of the tax assessment, two or more photographs of the front and back of the property, real estate sales/purchase contract, etc (Movant's Ex. 3, pg. 40).

7. These accounts were seized by separate action involving proceedings in the Caymans. The proceeds are the subject of a related civil forfeiture action, Case No. 97–682–Civ–Orl–19, pending in this District before District Judge Fawsett.

8. Although the Master Affidavit was sealed originally, Movants obtained a copy of a different affidavit used to support seizure of the Cayman Island accounts. That affidavit contained some, but not all, of the same information relied on by the government here. The Master Affidavit was therefore largely unsealed. Certain redacted portions remain sealed to protect the identities of confidential informants due to the on-going criminal investigation.

seizure warrants. *See* 28 U.S.C. § 636(a) and F.R.Cr. P. 41. The pending motion has been docketed in a Miscellaneous case file. As of the date of this Order, there are no pending criminal proceedings against Movants, nor is there a pending civil forfeiture action regarding this property.[9] The Court must therefore first consider its jurisdiction to hear and resolve this orphan motion.

### Rule 41(e) and the Supplemental Rules

■ Although the Movants urge that Rule 41(e), F.R. Cr. P., applies to civil forfeiture cases and provides a right to a hearing, this conclusion is not supported by case law in this circuit. "It is well-settled that the proper method for recovery of property which has been subject to civil forfeiture is not the filing of a Rule 41(e) Motion, but filing a claim in the civil forfeiture action." *United States v. Castro,* 883 F.2d 1018, 1019 (11th Cir.1989); *see* Rule 54(b)(5), F.R. Cr. P., providing that the rules are not applicable to "civil forfeiture of property for violation of a statute of the United States." Movants' reliance on *Floyd v. United States,* 860 F.2d 999 (10th Cir.1988), is misplaced. The Eleventh Circuit has expressly declined to follow the Tenth Circuit's opinion. *In re the Matter of Sixty Seven Thousand Four Hundred Seventy Dollars ($67,470.00),* 901 F.2d 1540, 1544, n. 4 (11th Cir.1990).

■ Similarly, Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims expressly disclaims any application to "actions by the United States for forfeitures for violation of any statute of the United States."

### Equitable Jurisdiction and the Fourth Amendment

■ The remaining grounds asserted by Movants, namely, the United States Constitution and "equitable principles" are recognized as sufficient to establish jurisdiction, in exceptional cases.

"Federal courts have developed the doctrine of 'equitable' or 'anomalous' jurisdiction to enable them to take jurisdiction over property in order to adjudicate actions for the return of unlawfully seized property even though no indictment has been returned and no criminal prosecution is yet in existence." *United States v. Chapman,* 559 F.2d 402, 406 (5th Cir.1977); *see In re, $67,470,* 901 F.2d 1540, 1545 (11th Cir.1990). In such circumstances, the only remedy is in equity. Nevertheless, "[t]he decision to invoke equitable jurisdiction is highly discretionary and must be exercised with caution and restraint. Such jurisdiction ... is only appropriate in exceptional cases where equity demands intervention." *Id.* at 1554.

*United States v. Dean,* 80 F.3d 1535, 1542 (11th Cir.1996). *See also Castro, supra,* 883 F.2d at 1020; *Robinson v. United States,* 734 F.2d 735 (11th Cir.1984) (upholding order to return property seized during a subsequently dismissed criminal prosecution, citing inherent equitable authority and due process concerns).

■ In *Richey v. Smith,* 515 F.2d 1239, 1243–44 (5th Cir.1975), the former Fifth Circuit set forth the considerations that should guide the exercise of the court's discretion to invoke its inherent equitable authority: 1) whether the government agents seized the property "in callous disregard for the constitutional rights" of the petitioner; 2) whether the petitioner has an individual interest in and need for the material he seeks to have returned; 3) whether the petitioner would be irreparably injured by denial of the return of the property; and 4) whether the petitioner has an adequate remedy at law. As articulated in *In re $67,470,* the crux of the matter is whether movants' conduct and the merits of his position require judicial review "to prevent manifest injustice." 901 F.2d at 1545.

■ Additionally, the Movants assert that the underlying Master Affidavit is false, within the meaning of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In *Franks,* in the context of a motion

---

**9.** As noted earlier, the Government has filed forfeiture proceedings against certain other bank accounts in the Cayman Islands. Those accounts were not the subject of the warrants at issue in this case. In addition, the merchant banker for the organization has filed motions regarding the seizure of a reserve account held by the bank as security for potential charge backs by unhappy consumers. Those motions are being considered separately from the present proceedings.

to suppress evidence, a criminal defendant sought to impeach the veracity of the affidavit used by police to authorize a search warrant which allowed police to seize incriminating evidence. The Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56, 98 S.Ct. at 2676.[10]

■■■ Based on the allegations of the Movants in their motion and supporting papers, the Court has anomalous jurisdiction to entertain Movants' claim. By its nature the pending motion is a pretrial civil matter which can be heard in the first instance by the United States Magistrate Judge. 28 U.S.C. § 636. The decision is of course reviewable by the presiding District Judge assigned to this miscellaneous docket. The Court now turns to the merits of the motion.

## Analysis

■■■ As is set forth above, the underlying concern for the Court is to prevent manifest injustice. Regardless of whether the *Richey* factors or the *Franks* test is applied, the question for the Court is whether irreparable harm will result from the government's retention of property allegedly seized in the absence of probable cause. As is detailed below, the Court finds that no manifest injustice currently exists.

## Probable Cause

■■■ Movants assert that the probable cause determination[11] made in the issuance of the seizure warrants was erroneous because: 1) the funds seized cannot be charac-

terized as "proceeds" of mail or wire fraud; 2) the Master Affidavit is based on false statements regarding lack of refunds and failure to partner deals.

### 1. Money Laundering "Proceeds"

■■■. Movants argue that the funds held by Charter Pacific Bank and by United Parcel Service are not "proceeds" for they represent funds from customers which had not yet reached the Movants (Doc. No. 49, pg.4). This contention misses the mark.

Title 18 U.S.C. § 981(a)(1)(A) authorizes forfeiture of property obtained in violation of certain statutes, including 18 U.S.C. § 1956 and § 1957 (money laundering statutes). These statutes make it a crime to deal in specific ways with proceeds of mail and wire fraud (§ 1956) or in banking transactions over $10,000 with funds which represent proceeds of mail or wire fraud (§ 1957). Movants argue that mere receipt of funds from illegal activity into the defendant's account is not money laundering; rather there must be a second step—the defendant, knowing the proceeds to be tainted, must conduct or attempt to conduct a transaction with the proceeds with the intent to promote specified unlawful activity, *citing United States v. Piervinanzi*, 23 F.3d 670 (2d Cir.1994).

In the instant case, Movants concede that the government never obtained funds from UPS pursuant to the search warrant (Doc. No. 49 at pg. 4–5). Movants are obviously not entitled to the return of something not taken in the first place.

■■■ With respect to the bank accounts, in certain situations, receipt of the funds meets the definition of "laundered funds." *See United States v. Mullens*, 65 F.3d 1560 (11th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1337, 134 L.Ed.2d 487 (1996). In

**10.** Movants present several due process issues. The Court interprets the Movants' papers as setting forth a procedural due process fight to be heard post-seizure. Movants also present a substantive challenge to the acts of the government in depriving Movants of their property without cause, and prior notice and opportunity to be heard, and to the continued deprivation of the property. It is appropriate to consider these challenges in determining whether to exercise the discretion to invoke the review that claim

under *28 U.S.C.* § *1331*. *See In re $67,470.00, supra,* 901 F.2d at 1545.

**11.** Movants belatedly objected to consideration of the motion by the same Magistrate Judge who issued the warrants. This contention is unavailing as well as untimely. Judges are frequently called upon to reconsider preliminary decisions in light of a more fully developed record. No due process problem is generated thereby.

*Mullens,* the defendant was convicted for money laundering and wire and mail fraud arising out of a Ponzi scheme. The Eleventh Circuit described the scheme:

> Mullen's plan was to solicit money from investors, and perpetuate the scheme and avoid detection by using the money to pay business expenses, attract other investors, and pay off earlier investors ... Mullens collected over $27 million from investors and deposited that amount into [his organization's] accounts. *Once deposited the funds met the definition of "laundered funds" under 18 U.S.C. § 1956(a)(1)(A)(i) because they had no purpose other than to promote the illegal business of the ponzi.* Thus, the amount of money collected through fraud was ... the total amount of funds involved in the ponzi.

65 F.3d at 1564–65 [emphasis added].

Here, the Master Affidavit set forth a number of actions undertaken with respect to the funds received by customers. Funds were moved offshore to foreign accounts (a classic example of laundering) and other funds were used for business expenses, such as to purchase air time to attract additional customers and otherwise "to perpetuate the scheme." As with *Mullens,* once the funds obtained by the alleged fraud were deposited, they had no purpose other than to promote the illegal business of the organization. For probable cause purposes, the affidavit supported the seizure of the accounts as "proceeds traceable" to the illegal activity.

### 2. Lack of refunds

■■■■ Movants next assert that the representations in the Master Affidavit regarding the organization's failure to honor its refund policy as advertised, are false and were made with "reckless disregard" for the truth. In papers and at hearing, Movants support this contention by arguing a) that the misrepresentations must be *material* to constitute mail or wire fraud (citing *United States v.*

*Brown,* 79 F.3d 1550 (11th Cir.1996)) and b) bank records show that numerous refunds were in fact made.

■■■■ The Court is unpersuaded by this argument. Materiality, as explained in the *Brown* case cited by Movants, is shown by proof that a reasonable person would have acted on the representations. 79 F.3d at 1557. A representation that a product is backed by "a 100% Unconditional Refund Guarantee" may well convince a reasonable person that he or she has nothing to lose by trying a product that could make them "filthy rich." The representation is clearly material and falls outside the realm of mere sales talk or puffing. It is a specific guarantee that the purchaser risks nothing by sending in his or her money. If, in fact, that representation is knowingly false, it is cognizable under the mail fraud statue.

■■■■ As for the bank records, the evidence at hearing[12] shows that if a consumer paid for the materials with a credit card, the McCorkles would not honor a refund request sent to them directly, but would leave the customer to be reimbursed, if at all, via a "charge back" issued by the merchant bank.[13] There was no evidence that the organization advised customers of this procedure. Indeed, the "100% Unconditional Refund Guarantee" directs consumers to call the organization (long distance) and ask for a refund number "authorizing the return." Then, consumers are directed to return the materials with a cover letter explaining why they are unsatisfied and stating their preauthorized refund number. The Master Affidavit revealed that consumers would call and be placed on hold indefinitely. Further, once the packages were sent back, the organization would deny that the packages were ever received. The Postal Inspector investigated dozens of complaints from consumers regarding McCorkle's failure to acknowledge

---

**12.** The evidence offered by Movants was inexplicably vague. As noted above, neither of the principals testified, despite their presumed superior knowledge of the business. The other witnesses were unable to provide praise or meaningful descriptions of the financial operations.

**13.** A charge back occurs when a customer contacts his credit card company and disputes the

charge. After an investigation, which can be lengthy, the merchant bank may issue a charge back to the credit card of the customer. That charge back is debited from the organization's account. Testimony at the hearing revealed that the Movants could, and did, challenge charge backs (Transcript June 9, 1997, pg. 249 and 250.)

delivery of returned packages. The Master Affidavit avers that the organization denied receipt of packages, even when the postal authorities had signed acknowledgments of delivery, by McCorkle's employees. The State of Florida Attorney General's office received hundreds of complaints about failure to receive refunds. The Master Affidavit reveals that McCorkle had a policy to process only a limited number of refunds per day, with refund requests that came through the Better Business Bureau or a governmental agency processed immediately. These averments are not lessened by Movants' arguments that if a consumer were smart enough and persistent enough, he or she would eventually get a charge back from their credit card company.

Although there was testimony and proof regarding some refunds that were made by the organization, the representations in the Master Affidavit—that refunds were not "unconditional," but often required the involvement of a third party such as the postal inspector, the credit card company or Better Business Bureau, and that the organization had a policy and practice that actively discouraged the issuance of refunds—remained unrebutted.[14] Movants have not shown that these statements are false and were made with reckless disregard for the truth.

### 3. Failure to partner deals

Movants' argument addressed to the allegations in the Master Affidavit regarding the organizations' failure to partner deals, as advertised, also misses the mark. Movants argue that they do, in fact, partner deals when the criteria is met. The evidence in the Master Affidavit, and as shown at hearing, contradicts this assertion.

Mr. Skouras, a consultant hired by McCorkle to "help the company" (Transcript June 10, 1997, pg. 7) confirmed the lack of deals going through and stated Mr. McCorkle's approach to deals as follows:

> Mr. McCorkle's approach to it was I package other people that can get involved with it, I have other investors and I don't have to put up my own money, I can get other people to put up the money and do deals

(Transcript June 10, 1997, pg. 35–Lines 20–24.)

Yet "getting McCorkle's money" is a consistent representation and theme throughout the advertisements and programs. McCorkle represents that *he* will "put up all the money for your deal" and that even purchasers of the $69 package "have a 100% claim to my TV offer to partner your deals" (Government's Exhibit #3). Although Movants appear to argue that it does not matter who puts the money up, the identity of your "partner" is obviously material in any partnership. McCorkle represents that *he* "will always be here to share a deal with you" and is available to confer with his "students" regarding deals. This on-going relationship is not puffery or seller's talk, but an acknowledgment of a relationship of trust, fiduciary in nature. Where such a relationship exists between a defendant and his intended victims, the federal fraud statutes are broadly interpreted and were intended by Congress to "protect the careless and naive from lupine predators ..." *United States v. Kreimer*, 609 F.2d 126, 131–132 (5th Cir. 1980); as quoted in *Brown, supra*, at 1557. Under the materiality test, a reasonable person, having seen and heard McCorkle and established a comfort level regarding him, may well have relied on this misrepresentation in deciding to purchase the product and do deals "with me."

Even if the identity of the financier were not material, the evidence introduced at hearing did not establish that *anyone* got "filthy rich" by partnering a deal with McCorkle. Most of Movants' witnesses had no knowledge of any deals that were partnered. The evidence indicated that McCorkle's "advisory staff" consisted of a handful of people, headed by Sammy Devane Smith, a former real estate broker and salesperson, with an inactive license. (Transcript, June 10, 1997, 140–142). Mr. Smith testified that the organization sold possibly 200,000 of the $69 packages during his tenure, and his department received hundreds of calls a day. Despite this volume, Mr. Smith was the only person in the organization that "qualified"

---

14. Indeed, Movants' witness at the hearing, Mr. Skouras confirmed the organization's staunch resistance to issuing a refund (Transcript June 10, 1997, pg. 30–31).

the deals. Mr. Smith's testimony was notably unimpressive, with Smith being unable to provide any specific details regarding any deals resulting from the hundreds of calls and facsimiles received daily.[15]

The Movants' evidence of partnered deals, which came in the form of testimony of certain "partners," did nothing to contradict the assertions in the Master Affidavit.

Movants called Eduardo Castillo, a student, who appeared in Mr. McCorkle's infomercial, where he stated "I only work half a month, the rest of the month I'm off. I will recommend it [the program] to anybody." However, Mr. Castillo testified that in two years he made a total of only $4,100.00 from deals with McCorkle. One of the two houses purchased in the deals is being rented, with all proceeds going to McCorkle. Moreover, the $4,100.00 figure does not exclude the costs of the programs purchased, the long-distance calls or any other expenses incurred by Mr. Castillo.

The two other "partners" called by Movants [16] testified that they have not made any money at all from the deals (Transcript, July 15, 1997, pg. 167; pg. 191).

Movants introduced nothing to contradict the numerous complaints, detailed in the Master Affidavit, from purchasers who claimed that they met the criteria and were still turned down for partnerships. In fact, the evidence presented supports the finding of probable cause.

Movants hired an attorney, Lee Bailey, to assist them in the investigation being undertaken by the State of Florida. In meetings with state officials, these representations were discussed, resulting in Mr. Bailey providing an annotated transcript version of the infomercial to the Attorney General's office (Government Exhibit A–3; letter from Mr. Bailey to Ms. Young dated November 5, 1996, regarding "subpoena compliance and other submissions"). In response to the state's request for production of documents supporting claimed profits made by persons depicted in the current infomercial, Mr. Bailey responded:

> In many of the below listed testimonials, either no profits are claimed or the Company did not participate in the transaction as a "partner;" in that event, the only record the company would have is the testimonial itself.

The annotations for each testimonial show that for the remaining handful of deals actually partnered by the organization, apparently only one person had actually purchased a property and resold it for a profit.

Based on the evidence presented from witnesses chosen by the Movants, the Court finds probable cause to conclude that the only people getting rich from the McCorkles' program are the McCorkles.[17] The statements in the Master Affidavit have not been shown to be false or made with reckless disregard for the truth.

### Badges of fraud

 In determining whether there is probable cause to believe that the Movants have committed mail or wire fraud, the Court looks to the presence or absence of the traditional "badges of fraud." *Brown,* 79 F.3d at 1557. Although Movants quibble with the nuances of particular representations,[18] the uncontradicted evidence set forth in the Master Affidavit and confirmed at hearing reveal a solid foundation for a finding of probable cause. Despite representations to the contrary, the McCorkles do not own the yacht, the jet or the helicopter. The boot camp seminars do not exist as described. The testimonials are deceptive and misleading. Representations of unconditional refunds were untrue. The number of deals partnered and the success of those deals is mis-

---

15. At one point, Smith even denied that he had seen the infomercial. (Transcript, pg.194).

16. Movants proffered that additional such witnesses were available to testify to similar effect. No proffer was made of evidence that anyone (other than the McCorkles) made substantial sums. The court presumes Movants chose to present their best evidence and most effective witnesses on this issue.

17. Though neither of the McCorkles testified, the evidence demonstrated that (contrary to the implications of the infomercials) the wealth the McCorckles have amassed does not come from doing real estate deals (alone or in partnerships), but from selling the programs to the public.

18. As in whether the five to six million dollars a month received by Movants in sales is gross profit or simply revenue.

represented. The McCorkles misrepresent the source of their wealth—the money comes from the sales of the program, not real estate deals. The "partnership" itself is mischaracterized—McCorkle as a rule does not use his own money.

While it is clear that some of the conduct complained of in the Master Affidavit has been ameliorated to some degree since Mr. Bailey's active involvement, additional badges of fraud are still evident [19]:

The moving of millions of dollars into offshore accounts;

The failure of movants to provide records to the State (despite numerous requests and a subpoena) or to their own experts and consultants;

The existence of nominee accounts, containing thousands of dollars;

The use of false names and false social security numbers by Mr. McCorkle in applying for credit cards;

Failure to disclose the existence of a bankruptcy proceeding in applying for a merchant bank account;

Representing, under oath in affidavit, and before this Court through counsel, that all assets had been tied up, when in fact close to three quarters of a million dollars had been placed by the McCorkles in a nominee account; [20]

Use of corporate assets to pay personal expenses.

Some of the purportedly ameliorative conduct is also suspicious. Movants' counsel hired a major accounting firm to prepare reports to be supplied to the Attorney General. Despite months of work, no reports have been produced. Movants did not even provide the Court with the accountants' engagement letter so the scope of their work could be evaluated. The lack of results under these circumstances (due in part to the organization's abominable record keeping and unresponsiveness to the accountants' requests for information) suggests that the accountants were retained for protective coloration rather than to establish any substantive assurance of the regularity of the business.

Movants' counsel also used a business consultant to evaluate the organization. That individual was denied the records he identified as necessary to complete his analysis. Again, it appears that at best Movants are trying to create an impression of respectability without any substance.

The affidavit supporting the finding of probable cause by a magistrate is presumed to be valid. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684, 57 L.Ed.2d at 682. Movants have presented nothing, in two and a half days of hearing, to alter that presumption.

### Irreparable Harm

■ Even assuming that Movants were able to support their challenge to the finding of probable cause, the record does not establish that irreparable harm has occurred. The evidence indicates that the organization is still operating, the infomercials are still running, and its bank account is still receiving funds. While it is true that the Government has seized records, it has offered copies of necessary documents to Movants. *In re Southeastern Equipment Co.*, 746 F.Supp. 1563 (S.D.Ga.1990) (photocopies are sufficient to avoid irreparable harm). Additionally, there is at least one nominee account in existence, indicating that Movants have access to certain funds, sufficient to maintain the status quo, for the immediate future. While the search and seizure of the property in this matter has obviously imposed a burden on Movants, the Movants failed to show, through evidence, that this burden is undue.

### Due Process

While the Court holds that Movants have failed to show irreparable harm at this point in time, this does not mean that the Government is free to act without restrictions in this matter. Just as justice delayed is justice denied, harm that is evident, but not all-encompassing, may ripen into the irreparable with the passage of time. This Court shares

---

**19.** Not all of these items are directly involved in the marketing program. While those items may not have directly influenced a consumer's buying decision, they are nonetheless probative of the McCorkles' business methods.

**20.** *See* the testimony of Assistant Attorney General Lisa Young regarding this and other accounts. Transcript of July 15, 1997, pgs. 86–100.

the concerns of several other courts and commentators regarding the possibility of the "increasing and virtually unchecked use of the civil forfeiture statutes and the disregard for due process that is buried in those statutes." *United States v. All Assets of State-wide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir.1992). Thus, a close examination of the law respecting the government's actions is appropriate.

Movants have asserted that the seizures and the continued retention of the property seized violates their due process rights. There is no dispute that notice and a hearing are necessary to *permanently* deprive Movants of their rights in the seized property. At issue is when the initial seizure becomes a sufficient taking as to trigger the due process clause.

We begin with the recognition that the postponement of notice and a hearing until after an initial forfeiture seizure of personal property takes place does not deny due process. *Calero–Toledo v. Pearson Yacht Leasing, Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850)*, 461 U.S. 555, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983). While Movants present an elaborate analysis based on the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) and *United States v. Daniel Good*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), the Court does not find the analysis persuasive. The *Good* decision addressed the unique concerns present in the forfeiture of real property, a situation not present here. Further, the Supreme Court noted in *$8,850* (post *Mathews*), that when the government seizes items subject to forfeiture, due process does not require a pre-seizure hearing. 461 U.S. at 563, n. 12, 103 S.Ct. at 2011 n. 12 (*citing Calero–Toledo, supra*). Here, as in *Calero–Toledo* and *$8,850*, the seizure was made by governmental officials rather than self-motivated third parties and serves important governmental purposes which would be frustrated by pre-seizure notice. Thus, the initial seizure, based upon affidavit submitted to a neutral magistrate, comported with the requirements of due process. *United States v. Bissell*, 866 F.2d 1343, 1352 (11th Cir.1989)

(no right to a hearing before government restrains assets subject to forfeiture).

In *United States v. $8,850*, supra, the Supreme Court applied the four factor balancing test established in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972) to determine whether a particular delay in commencing forfeiture proceedings violates due process. The *Barker* test involves the weighing of four factors: 1) length of the delay; 2) reason for the delay; 3) the defendant's assertion of his rights and 4) prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2191–92.

### Length of delay

At this point, the delay has been almost three months. Many courts have held delays of less than eight months to be insufficient to trigger due process objections. *See Bissell, supra*, 866 F.2d at 1353. While being deprived of property is always a burden, the length of the delay so far is not so unusual or significant to trigger a denial of due process.

### Reason for the delay

The government asserts in its papers that the delay is founded upon a pending criminal investigation of McCorkle and his organization and "the civil judicial forfeiture procedure as to the property" (Doc. No. 5, pg. 11–132). By this, the Court assumes that the government is representing the need to research, process and assign the action to the appropriate government agency. The Court finds the reasons to be valid, at this point in time. The magnitude of the seizure, however, mitigates against any foot dragging or leisurely review of the matter by the government. The government has obviously done enough homework to put together a Master Affidavit sufficient to establish probable cause. In addition, the government has proceeded with filing a civil forfeiture action regarding the funds deposited in the Caymans.

While a certain amount of time is necessary to complete processing the information, draft a complaint and institute a forfeiture action or file criminal charges (if the government so chooses), that time is not unlimited. This conclusion is buttressed by consider-

ation of the remaining elements, assertion of rights and prejudice to the defendant.

■ Requiring the government to proceed with reasonable dispatch or return the property does not act as a statute of limitations. An arrested defendant has a right to insist on the bringing of formal charges or to have the charges dropped without prejudice. Likewise, an individual most of whose property has been seized has some right to insist on reasonably prompt proceedings to determine the propriety of the seizure or to have the property returned without prejudice to the possible future proceedings.

### Assertion of rights/ Prejudice to Defendant

Unlike the defendants in *Bissell* and *Barker*, the Movants here have moved quickly to object to the seizure. This factor weighs in Movants' favor.

■ The test for prejudice appears to be whether the delay hampers the claimants' defense on the merits of the case. *Bissell*, 866 F.2d at 1343. Here, there is no assertion that the delay has resulted in loss of witnesses or important evidence, or any other cognizable harm to Movants' ability to defend themselves. The only harm asserted by Movants is the financial burden caused by the deprivation of the property itself, not the length of the delay.[21]

Based on a weighing of all four factors, the court concludes that the delay, to date, has not been significant enough to amount to a denial of due process. However, the scope of the seizure is significant enough to heighten the Court's concerns regarding prompt, final resolution of this matter, via the timely institution of criminal proceedings, civil forfeiture proceedings, or no proceedings and a return of the property.

### Conclusion

Based on the foregoing, the Court **HOLDS** as follows:

1. The Court has equitable jurisdiction to consider the merits of the motion;

2. The motion is **DENIED** to the extent it seeks return of the property at this time; disclosure of the redacted portions of the Master Affidavit, and appointment of a Special Master.

3. The motion is **GRANTED** to the extent it seeks the filing of returns to advise the Movants of the exact amount and status of the funds seized. The government shall provide the information within 15 days of the date of this Order.

4. The request for a continuance of the hearing to present additional evidence is DENIED.

5. The government's offer to allow inspection and copying of the documents by Movants is **APPROVED.**

6. The Movants have filed an Emergency Motion regarding the Government's Review of Attorney-Client privileged documents (Doc. No. 40). The Court disapproves of the government's use of a taint team to review the documents. Thus, the Motion is **GRANTED**, to the extent it seeks an immediate cessation of government review of the allegedly privileged documents. The government is **ORDERED** to make all allegedly privileged documents seized available to the Movants for inspection and copying. To the extent Movants claim privilege, Movants are to prepare a privilege log and submit it to the court, under seal. The Court will then proceed to review the assertions of privilege, in due course.

7. The Court finds that there is little of record justifying a substantial delay in instituting forfeiture proceedings. Accordingly, the government **shall, by October 31, 1997,** either institute formal civil or criminal forfeiture proceedings, or return the seized assets claimed as subject to forfeiture.

**DONE and ORDERED.**

---

**21.** As noted earlier, this deprivation was not shown to be as devastating as pled. The business was not "shut down," but continues to operate. Infomercials continue to air and money contin-

ues to come in. Moreover, the existence of at least three quarters of a million dollars in nominee accounts eliminates any Sixth Amendment challenge based on inability to afford counsel.